**GROVE HOLDING CORPORATION, a Wisconsin corporation; Alvin H. Kriger, an individual; G. Hans Moede, III, an individual; David J. Parsons, an individual; and Joseph C. White, an individual, Plaintiffs,**

v.

**FIRST WISCONSIN NATIONAL BANK OF SHEBOYGAN, a national banking association; Donald M. Vande Yacht, an individual; and Grant Thornton, a partnership, Defendants.**

No. 91–C–0096.

United States District Court, E.D. Wisconsin.

Sept. 11, 1992.

Joe E. Edwards, T.P. Howell, Edwards, Sonders & Propester, Oklahoma City, Okl., for plaintiffs.

David E. Leichtfuss, Michael, Best, & Friedrich, Milwaukee, Wis., for First Wisconsin.

Michael R. Wherry, Harold A. Laufer, Alyson K. Sloan, Davis & Kuelthau, Milwaukee, Wis., Herbert L. Zarov, Ira J. Belcove, Stanley J. Parzen, Mayer, Brown & Platt, Chicago, Ill., for Grant Thornton.

Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, Wis., for Donald M. Vande Yacht.

## DECISION AND ORDER

WARREN, Senior District Judge.

On January 28, 1991, plaintiffs filed a Complaint against defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") as well as other state law causes of action, including misrepresentation and violations of the Wisconsin Organized Crime Control Act. Now before the Court are the motions to dismiss of defendant Grant Thornton, defendant Donald M. Vande Yacht and defendant First Wisconsin National Bank of Sheboygan.

## I. FACTUAL ALLEGATIONS IN PLAINTIFFS' COMPLAINT

### A. PARTIES

Plaintiff Grove Holding Corporation ("Grove") is the successor in interest to Maple Grove Whey Producers' Limited Partnership ("WPC Partnership") and Maple Grove Lactose Limited Partnership ("Lactose Partnership"), both Wisconsin limited partnerships which have been dissolved. Complaint at ¶ 1. Plaintiffs Alvin H. Kriger, G. Hans Moede, III, David J. Parsons and Joseph C. White (the "individual plaintiffs") are adult residents of the State of Wisconsin. Id. at ¶¶ 2–5.

Defendant Donald M. Vande Yacht is a resident of the State of Wisconsin. Id. at ¶ 6. From February 3, 1971 to October 9, 1987, Mr. Vande Yacht was the chief executive officer of Kasson, Inc. USA ("Kasson"), a Wisconsin corporation with its principal place of business in Maple Grove, Wisconsin. Id. at ¶ 11. Mr. Vande Yacht participated directly in the conduct of Kasson's affairs and owned 90% or more of the stock of Kasson from April 17, 1974 to October 9, 1987. Id. at ¶¶ 11, 13.

Defendant First Wisconsin National Bank of Sheboygan ("First Wisconsin") is a national banking association with its principal office in Sheboygan, Wisconsin. Id. at ¶ 7. Since September 21, 1976, First Wisconsin has been Kasson's principal bank and has received Kasson's monthly financial statements through the United States mail. Id. at ¶ 14. During the period from September 12, 1976 to October 9, 1987, officers of First Wisconsin regularly attended meetings of Kasson's board of directors and shareholders and regularly provided financial advice to Kasson. Id. at ¶ 14.

Defendant Grant Thornton ("Thornton") is a partnership with its principal place of business in Chicago, Illinois and with other offices in Fond du Lac, Wisconsin and Appleton, Wisconsin. Id. at ¶ 8. Grant Thornton performed audits of Kasson's annual financial statements for the fiscal years ending October 31, 1977 through October 31, 1985. Id. at ¶ 15. For each such year, Grant Thornton rendered its opinion that the financial statements presented fairly the financial position of Kasson as of year end, in conformity with generally accepted accounting principles. Id. at ¶ 15. Grant Thornton also provided compilations of Kasson's monthly financial statements from 1977 through 1985. Id. Grant Thornton distributed copies of each of Kasson's annual and monthly financial statements and Thornton's opinions through the United States mail. Id. During the fiscal years 1977 through 1985, employees or partners of Thornton regularly attended meetings of Kasson's Board of Directors and shareholders and regularly provided financial planning and advice to Kasson. Id.

### B. INITIAL IMPLEMENTATION OF PATTERN OF DECEPTION BY VANDE YACHT, FIRST WISCONSIN AND THORNTON

Kasson was subject to the provisions of Wisconsin Dairy Plant Security law. Vande Yacht, First Wisconsin and Thornton knew that Kasson would be able to maintain its dairy plant license without a trusteeship by filing audited financial statements with the Wisconsin Department of Agriculture that reported a ratio of current assets to current liabilities of 1.2 to 1 or greater and a positive net worth for two consecutive years. Id. at ¶ 18. Vande Yacht, First Wisconsin and Thornton knew that, upon termination of the trusteeship, Kasson's lenders would be able to obtain a first lien on Kasson's most liquid and most valuable assets, its accounts receivable and inventory. Id. at ¶ 19.

From September 1977 through October 1987, Vande Yacht, First Wisconsin and Thornton developed and implemented a plan restructuring Kasson's financial affairs to give it the appearance of being a going concern with adequate stockholders' equity, working capital and liquidity. Id. at ¶ 20. By helping Kasson eliminate its trusteeship, the First Wisconsin positioned itself to earn high profits at low risks by making loans to Kasson which were guaranteed by the Farmers Home Administration ("FmHA") or the United States Small

Business Administration ("SBA"). *Id.* at ¶ 21.

The defendants restructured Kasson's financial affairs primarily through relatively short term loans which were classified as long term liabilities and which allowed Kasson to report a "current ratio" of greater than 1.2 to 1. *See, e.g., id.* at ¶¶ 30, 37, 52, 60, 77, 162. By maintaining a current ratio of greater than 1.2 to 1, Kasson was able to satisfy the standards for maintaining a dairy plant license without a trusteeship or security. *See, e.g., id.* at ¶ 30. Thus, the sole or primary purpose of these loans was to create an appearance that Kasson had sufficient working capital and thereby to deceive the Wisconsin Department of Agriculture and other readers of Kasson's financial statements. *See id.* at ¶ 39.

Defendants also were involved in Kasson's illegal use of casein and the concealment of that use. In September 1981, Kasson began using casein in its manufacturing process in order to increase profits. *Id.* at ¶ 61. Wisconsin and federal standards prohibited Kasson from selling products containing casein as cheese. *Id.* at ¶ 62. Kasson's financial statements for the fiscal year ending October 31, 1982 failed to disclose that it had illegally used casein in its manufacturing process throughout 1982. *Id.* at ¶ 69. Those financial statements were transmitted to the Wisconsin Department of Agriculture through the United States Mail. *Id.*

On May 11, 1982, First Wisconsin arranged for a revolving credit facility for Kasson at a finance company, in the maximum amount of $1,250,000, secured by Kasson's accounts receivable and finished goods inventory. *Id.* at ¶ 65. First Wisconsin retained a fifty percent interest in this loan. *Id.* First Wisconsin obtained consents to subordinate all Kasson's FmHA and SBA guaranteed loans to the revolving credit facility by, among other things, representing that Kasson's land, buildings, machinery and equipment had sufficient fair market value to secure adequately the guaranteed loans. *Id.* at ¶ 67. The Bank knew or should have known that

these representations were not true. *Id.* at ¶ 68.

## C. THE WHEY PROTEIN CONCENTRATE PROJECT

In late 1983, Mr. Vande Yacht began discussing with plaintiffs White and Parsons the design, construction and financing of a project for processing Kasson's whey used by Kasson (the "WPC Project"). These discussions culminated in the formation of the WPC Partnership for the purpose of financing, constructing, owning and operating a whey protein concentrate plant ("WPC Plant") to process Kasson's whey. *Id.* at ¶ 79. On January 19, 1984, the Wisconsin Department of Agriculture warned all cheese factories in the state that the use of casein or any form of whey in the manufacturing of cheese varieties for which there was a standard of identity constituted a violation of Wisconsin as well as federal law. *Id.* at ¶ 81. Kasson had used millions of pounds of casein in its cheese since September 1981 and was using about forty thousand pounds of casein additive per week at the time of this warning. *Id.* at ¶ 83. Kasson continued to use casein until March of 1984 despite the warning. *Id.* at ¶ 84.

On or about June 5, 1984, through the mails, Thornton provided plaintiffs Moede and Kriger with (1) projections of the profitability of the proposed WPC Plant and (2) projections of the financial position and results of operations of Kasson for the fiscal years ending October 31, 1984 through 1993. *Id.* at ¶ 99. Such projections were misrepresentations because, among other things, (1) they were not in accordance with the actual beliefs of defendants Vande Yacht and Thornton, (2) they omitted disclosure of the sham loans and (3) they omitted disclosure of Kasson's use of casein. *Id.* at ¶ 100.

On September 29, 1984, Kasson entered into an agreement for the sale of whey protein concentrate to Land O' Lakes, Inc. *Id.* at ¶ 104. The agreement provided for Land O' Lakes to purchase all the whey protein concentrate manufactured by Kasson from October 1, 1984 to September 30,

1988 up to a maximum of two hundred thousand pounds per month at a fixed price. *Id.* At that time, Kasson had no whey protein concentrate manufacturing capability. *Id.*

On November 27, 1984, plaintiffs Moede and Kriger met with Charles Riley and Russell Schuler, both then vice presidents at First Wisconsin. *Id.* at ¶ 109. They discussed the WPC Project and plaintiffs Moede and Kriger's concerns regarding Kasson's financial condition. *Id.* At the meeting, Riley and Schuler made the following representations:

(1) First Wisconsin had previously been concerned about the quality and depth of Kasson's management but was currently satisfied;

(2) First Wisconsin had many other cheese companies as customers, knew the cheese business, monitored Kasson's situation daily and would see to it that someone continued to make cheese in the Kasson plant if Kasson were to fail;

(3) Kasson was utilizing its credit facilities fully in August but currently had excess availability;

(4) First Wisconsin had approved Kasson's 1984 capital budget before Kasson knew it had an operating problem;

(5) Kasson's 1984 losses were non-recurring and not indicative of Kasson's true earning power.

(6) Kasson could improve its liquidity by deferring more capital spending if it wished, without substantial adverse effect on its business;

(7) Kasson had adequate liquidity and working capital to carry on its business;

(8) The WPC Project would greatly strengthen Kasson; and

(9) First Wisconsin would consider modifying its loan agreements with Kasson and giving assurances regarding its willingness to continue providing credit to Kasson in order to induce the WPC Partnership to finance, construct, own and operate the WPC Plant.

On January 28, 1985, the WPC Partnership entered into a number of agreements with Kasson regarding the WPC Project, including an agreement to purchase Kasson's interest in its agreement with Land O' Lakes, Inc. for a $500,000 note payable to Kasson. *Id.* at ¶ 112. In the January 28, 1985 agreement and through the use of the mails, First Wisconsin represented to the WPC Partnership that Kasson was not in default under its loan agreements. *Id.* at ¶ 115.

Defendants Vande Yacht, First Wisconsin and Thornton made misrepresentations to the WPC Partnership before and at the time the WPC Partnership entered into the January 28, 1985 agreements. *Id.* at ¶ 117. Defendant Vande Yacht and Thornton represented that Kasson's audited financial statements for the fiscal years ending October 31, 1981, 1982 and 1983 were prepared in accordance with generally accepted accounting principles applied on a consistent basis and fairly represented the financial position of Kasson on the dates thereof. *Id.* at ¶ 118. First Wisconsin participated in the misrepresentation by making loans for the sole and primary purpose of effecting Kasson's apparent financial position. *Id.* at ¶ 121. Defendant Vande Yacht further represented to the WPC Partnership that Kasson had ceased using additives, that he had taken responsibility for production himself, that Kasson's losses were nonrecurring, and that such losses were not indicative of Kasson's true earning power. *Id.* at ¶ 123. First Wisconsin made the same representations at a meeting on November 27, 1984. *Id.* at ¶ 124. Defendant Vande Yacht, via counsel, represented to the WPC Partnership that Kasson had not used illegal additions in its cheese. *Id.* at ¶ 125. Defendants Vande Yacht and Thornton represented their expectations to the WPC Partnership regarding the financial position of Kasson from October 31, 1984 through 1993 by providing forecasts that in 1984 and future years Kasson would have adequate liquidity and working capital to carry on its business and would be profitable. *Id.* at ¶ 126. In a letter agreement dated January 28, 1985, First Wisconsin represented to the WPC Partnership that, to the best of its knowledge, Kasson was not in default under any loan, credit or security agreement, promis-

sory note or other agreement with respect to borrowed money or security therefor. *Id.* at ¶ 127.

Finally, all defendants made misrepresentations to the WPC Partnership by failing to disclose the following material facts:

(1) All defendants were engaged in the schemes to misrepresent Kasson's financial position and operations which are described above;

(2) First Wisconsin made loans to Kasson which did not meet the minimum standards for FmHA or SBA guaranteed loans, but nonetheless did obtain such guarantees;

(3) First Wisconsin made loans to Kasson for the sole or primary purpose of enabling Kasson to misrepresent its financial position;

(4) First Wisconsin engaged in transactions with Kasson which were made to appear to be loans, but which were not loans, for the sole purpose of enabling Kasson to misrepresent its financial position;

(5) The Wisconsin Department of Agriculture determined that Kasson had been guilty of "window dressing" in its 1983 financial statements;

(6) Kasson had failed to notify its milk producers that the Wisconsin Department of Agriculture had ordered it to post security by making deposits in escrow in order to maintain its dairy plant license;

(7) Kasson had used casein as an additive from September, 1981 through February, 1984;

(8) Kasson had violated Wisconsin and federal law by selling its products as cheese during the period it used casein;

(9) The Wisconsin Department of Agriculture had warned Kasson in a letter dated January 19, 1984 that it was unlawful to sell as cheese the products it manufactured with casein additives;

(10) Kasson's net loss for the fiscal year ending October 31, 1984, was understated in the amount of $138,306, due to the fact that Kasson had failed to pay invoices in that amount for casein which it received and used in that fiscal year;

(11) One of Kasson's casein suppliers had commenced an action to recover $138,306 from Kasson for failing to pay for casein received and used in Kasson's fiscal year ending October 31, 1984; and

(12) Kasson was not a going concern and would be forced to discontinue operations and/or seek protection under the bankruptcy laws in the event the WPC Partners failed to agree to finance, construct, own and operate the proposed WPC Plant.

### D. DEFENDANT'S MARCH 23, 1984 MEETING

On March 23, 1984, Mr. Vande Yacht, First Wisconsin and Thornton met and discussed: (1) the need to respond to the Department of Agriculture's demand for security; (2) Kasson's financial condition; (3) Kasson's use of casein; (4) Kasson's cost reduction plans; (5) Kasson's opportunity to profit from the WPC Project; and (6) the need to work together as a team to solve Kasson's problems. *Id.* at ¶ 89. Mr. Vande Yacht disclosed at the meeting that Kasson would defer payment of overdue invoices to trade creditors in order to meet its next payroll but that Kasson would be unable to pay its milk producers in the month of April without additional loans from First Wisconsin. *Id.* at ¶ 90. Mr. Vande Yacht blamed Kasson's financial crisis on production problems which he attributed to the use of casein in 1983. *Id.* At the meeting, defendants discussed the alternatives available to Kasson, including liquidation or reorganization under federal bankruptcy laws, sale of the company and additional loans by First Wisconsin. *Id.* at ¶ 91. At the meeting, First Wisconsin advised that it had not disclosed Kasson's predicament to the SBA. *Id.* at ¶ 92.

### E. FIRST WISCONSIN AND KASSON'S DEALINGS WITH THE SBA AND FmHA

On March 30, 1984, First Wisconsin requested the SBA (1) to subordinate its liens on Kasson's machinery and equipment to a new $300,000 loan to be made by First Wisconsin and (2) to increase by $500,000 the maximum amount Kasson would be

permitted to draw on its revolving credit facility. *Id.* at ¶ 93. First Wisconsin falsely represented to the SBA, through the use of the mails, that Kasson's SBA-guaranteed loans would be adequately secured after the subordination, additional loans and an increase in the revolving credit facility. *Id.* at ¶ 94. On April 6, 1984, the SBA complied with the Bank's subordination request and the Bank loaned $300,000 to Kasson during the months of April, May and June to enable Kasson to pay its milk suppliers. *Id.* at ¶ 95. This loan was guaranteed by defendant Vande Yacht who at the time had no substantial assets other than his stock of Kasson. *Id.* at ¶ 96.

In October 1984, the lead lender on Kasson's revolving credit facility agreed to increase the Kasson's maximum draw by $500,000 at the request of First Wisconsin. *Id.* at ¶ 107. Defendants transmitted this request through the use of the United States Mails. *Id.* First Wisconsin obtained consent of the SBA and the FmHA by falsely representing, through the United States Mails, that Kasson's SBA and FmHA guaranteed loans would be adequately secured after such increase. *Id.* at ¶ 108.

### F. MISREPRESENTATIONS REGARDING $550,000 LOAN

On January 28, 1985, First Wisconsin granted Kasson a loan of $550,000, due in one payment on December 31, 1986 and secured by a $500,000 note of the WPC Partnership. *Id.* at ¶ 129. On January 29, 1985, Kasson issued its financial statements for the fiscal year ending October 31, 1984. *Id.* at ¶ 130. Kasson transmitted these financial statements by mail to the Wisconsin Department of Agriculture, First Wisconsin and the WPC Partnership. *Id.* The statements classified the $550,000 loan as a long term liability and the funds on deposit in the escrow account as current assets. *Id.* at ¶¶ 131–132. The classifications of the $550,000 loan and the escrow funds were false and misleading. *Id.* at ¶ 133.

### G. KASSON'S JANUARY 30, 1985 STOCKHOLDERS' MEETING

On January 30, 1985 at Kasson's annual meeting of shareholders and a meeting of its board of directors, defendant Vande Yacht disclosed that Kasson had realized $138,306 of extraordinary income of a nonrecurring nature in 1984 because it had not paid for all the casein it used. *Id.* at ¶ 136. Kasson's 1984 financial statements did not disclose the extraordinary income or the existence of a casein lawsuit. *Id.* at ¶ 137.[1]

### H. FRAUDULENT STOCKHOLDERS' EQUITY OF KASSON

On October 31, 1985, defendant Vande Yacht entered into a subscription agreement with Kasson to purchase two hundred shares of stock at a price of $200,000. In January 1986, First Wisconsin granted defendant Vande Yacht a loan in the amount of $200,000. *Id.* at ¶ 140. Defendant Vande Yacht had no ability to make the required installment payments on the loan except with funds supplied by Kasson. *Id.* at ¶ 141.

On January 16, 1986, Kasson issued its financial statements for fiscal year 1985. *Id.* at ¶ 142. Those financial statements were mailed to the Wisconsin Department of Agriculture, the Bank and the WPC Partnership. *Id.* Kasson's 1985 financial statements reported an increase in stockholder's equity of two hundred thousand dollars, attributable to defendant Vande Yacht's satisfaction of his subscription agreement. *Id.* at ¶ 143. In April through September 1986, First Wisconsin permitted Kasson to make payments to it in the total amount of $200,000 which the Bank applied to repay the full principal balance of the $200,000 loan to defendant Vande Yacht. *Id.* at ¶ 144. Kasson treated such payments as payments in redemption of the stock which defendant Vande Yacht had purchased. *Id.* at ¶ 145.

---

1. On September 16, 1985, the casein lawsuit was dismissed on the ground that Kasson's use of the casein was illegal and both Kasson and the supplier knew it was illegal. *Id.* at ¶ 138.

I. CHANGE IN ACCOUNTING FIRMS

In 1986, Kasson retained a different accounting firm, and Thornton ceased to perform services for Kasson. *Id.* at ¶ 147.

J. THE LACTOSE PLANT

In 1986, Kasson and First Wisconsin began discussing with plaintiffs Kriger, Moede, Parsons and White the design, construction, ownership, operation and financing of the plant (the "Lactose Plant") adjacent to the WPC Plant. *Id.* at ¶ 149. The Lactose Plant was to produce lactose from the whey permeate produced by the WPC Plant as a by-product. *Id.*

On October 31, 1986, the Lactose Partnership, Kasson, First Wisconsin and the WPC Partnership entered into agreements regarding the Lactose Project. *Id.* at ¶ 151. On December 10, 1986, the Bank provided written confirmation of its consent to the agreements for the construction, operation, ownership and financing of the Lactose Plant. *Id.* at ¶ 152. In addition, First Wisconsin subordinated its security interest in certain Kasson assets to the interests of the Lactose Partnership's lender, the Lactose Partnership and the WPC Partnership. Finally, First Wisconsin represented that Kasson was not in default under its loan agreements. *Id.*

Defendants Vande Yacht and First Wisconsin made misrepresentations to the WPC Partnership and the Lactose Partnership before and at the time the Partnerships entered into the agreements for the Lactose Project. First defendants Vande Yacht and First Wisconsin repeated to the WPC Partnership and the Lactose Partnership the misrepresentations they had previously made to the WPC Partnership in connection with the WPC agreements by failing to correct them in the course of negotiating agreements regarding the Lactose Partnership. *Id.* at ¶ 155. Second, defendants Vande Yacht and First Wisconsin made misrepresentations by failing to disclose the following material facts:

(1) First Wisconsin's purported loan of $200,000 to Vande Yacht was in substance a loan to Kasson;

(2) Kasson's true stockholder's equity was a deficit of $197,022 as of the end of its 1985 fiscal year;

(3) All defendants were engaged in the schemes to misrepresent Kasson's financial position and operations which are described above;

(4) First Wisconsin made loans to Kasson which did not meet the minimum standards for FmHA or SBA guaranteed loans, but nonetheless did obtain such guarantees;

(5) First Wisconsin made loans to Kasson for the sole or primary purposes of enabling Kasson to misrepresent its financial position;

(6) First Wisconsin engaged in transactions with Kasson which were made to appear to be loans, but which were not loans, for the sole purpose of enabling Kasson to misrepresent its financial position;

(7) The Wisconsin Department of Agriculture determined that Kasson had been guilty of "window dressing" in its 1983 financial statements;

(8) Kasson had failed to notify its milk producers that the Wisconsin Department of Agriculture had ordered it to post security by making deposits in escrow in order to maintain its dairy plant license;

(9) Kasson had used casein as an additive from September, 1981 through February, 1984;

(10) Kasson had violated Wisconsin and federal law by selling its products as cheese during the period it used casein;

(11) The Wisconsin Department of Agriculture had warned Kasson in a letter dated January 19, 1984 that it was unlawful to sell, as cheese, products manufactured with casein additives;

(12) Kasson's net loss for the fiscal year ending October 31, 1984, was understated in the amount of $138,306 by the fact that it had failed to pay invoices in that amount for casein which it received and used in that fiscal year;

(13) One of Kasson's casein suppliers had commenced an action to recover $138,306 from Kasson for failing to pay

for casein received and used in Kasson's fiscal year ending October 31, 1984;

(14) Kasson was not a going concern and would be forced to discontinue operations and/or seek protection under the bankruptcy laws in the event the WPC Partners failed to agree to finance, construct, own and operate the proposed WPC Plant; and

(15) The financial statements of Kasson that had been given to the WPC Partnership and Lactose Partnership contained material misstatements and omissions.

*Id.* at ¶ 156.

In the spring or summer of 1987, Kasson began using whey cream as an additive in its cheese manufacturing process for the purpose of increasing profits. *Id.* at ¶ 166. Wisconsin and federal standards regarding cheese identity prohibited Kasson from selling as cheese products containing whey cream. *Id.* at ¶ 167. Kasson used whey cream in products which it sold as cheese until defendant Vande Yacht sold Kasson to plaintiff Grove on October 9, 1987. *Id.* at ¶ 168. Kasson concealed this fact from Grove. *Id.*

### K. SALE OF KASSON TO GROVE

In 1987, defendant Vande Yacht and plaintiffs Moede, Kriger, Parsons and White began discussing the sale by Vande Yacht of all stock of Kasson to the WPC Partnership. *Id.* at ¶ 169. The WPC Partnership consequently engaged Robert W. Baird & Company, Inc. ("Baird") to render an appraisal of the fair market value of the stock of Kasson and engaged Myron Dean ("Dean") to perform an analysis of Kasson's operations. *Id.* at ¶ 170. Plaintiffs provided defendant Vande Yacht a copy of Dean's report and asked him to comment on it and correct any inaccuracies. *Id.* at ¶ 172. Defendant Vande Yacht answered that he believed Dean's report was substantially accurate and fair. *Id.* Defendant Vande Yacht had failed to disclose to Dean that Kasson had illegally used casein in its manufacturing process from September of 1981 through February of 1984 and was illegally using whey cream during 1987. *Id.* at ¶ 173.

John Emory, then vice president of Baird, reviewed, among other things, (1) Kasson's financial statements for the years 1981 through 1986, (2) a summary of Kasson's financial position and results of operation for the years 1971 through 1986, (3) the agreements among Kasson and the WPC and Lactose Partnerships and (4) Dean's report. *Id.* at ¶ 174. Mr. Emory issued a draft appraisal and provided defendant Vande Yacht's attorney a copy on July 8, 1987. *Id.* at ¶ 176.

On August 13, 1987, plaintiff Moede discussed the possibility of acquiring Kasson with Mr. Schuler, then vice president of First Wisconsin. *Id.* at ¶ 179. Mr. Schuler stated that First Wisconsin would be interested in providing financing for such an acquisition. *Id.*

On September 22, 1987, defendant Vande Yacht and the WPC Partnership agreed on the price to be paid for the Kasson stock. *Id.* at ¶ 180. Plaintiffs disclosed the terms of the proposed acquisition to First Wisconsin and asked whether it remained interested in providing financing. *Id.* at ¶ 182. First Wisconsin stated that it would be interested. *Id.* at ¶ 183. Plaintiff Moede then provided copies of the Baird appraisal and the Dean analysis to First Wisconsin. *Id.* at ¶ 184.

At this time, plaintiffs formed a Wisconsin corporation named Grove Holding Corporation ("Grove") to effectuate the purchase of Kasson. *Id.* at ¶ 187. Thereafter, the individual plaintiffs acted as agents of Grove. *Id.*

On October 7, 1987, First Wisconsin advised plaintiffs Moede, Kriger, Parsons and White that it would not make a loan to Grove, guaranteed by the individual plaintiffs, but that it would make a loan to Grove and Kriger, Moede, Parsons and White, jointly and severally. *Id.* at ¶ 189. It was understood that the proceeds of the loan would be placed into Grove's account with part of the funds used to purchase Kasson's shares and part to invest in Kasson. *Id.*

On October 9, 1987, the individual plaintiffs and Grove, First Wisconsin and Vande

Yacht executed and delivered agreements for the purchase of all stock of Kasson by Grove and the financing thereof. *Id.* at ¶ 192.

### L. MISREPRESENTATIONS RE: SALE OF KASSON

In an August 5, 1987 letter to plaintiff Moede, defendant Vande Yacht represented that he believed Kasson's total debt as of October 31, 1987 would be the same as its total debt as reported in its June 30, 1987 financial statements with the following exceptions:

(1) Some portion of the $425,000 loan of July 15, 1987 would be incurred;

(2) The maximum loan on Kasson's revolving credit facility would be increased to $3 million, and Kasson would draw up to that amount;

(3) Kasson's other debt existing as of June 30, 1987 would be reduced by regularly scheduled payments.

*Id.* at ¶ 195. In actuality, Kasson was forced to borrow approximately $345,000 in addition to the debt which defendant Vande Yacht represented it would have as of October 31, 1987. *Id.* at ¶ 196. In addition as of that date, Grove was forced to subscribe to nearly $500,000 of new Kasson stock in order to meet the standards for maintaining Kasson's dairy plant license without a trusteeship or security. *Id.*

Moreover, defendant Vande Yacht made the following misrepresentations in the Stock Purchase Agreement executed and delivered on October 9, 1987.

(1) Defendant Vande Yacht represented that Kasson's financial statements for the year ending October 31, 1986, were prepared in accordance with generally accepted accounting principles applied on a consistent basis and fairly represented the financial position of Kasson. *Id.* at ¶ 198. This representation was false and misleading because the financial statements classified funds in the escrow account as current assets, classified First Wisconsin's October 31, 1986 loan as a long term liability, failed to disclose that Kasson's results of operations in 1981 through 1984 and 1987 were achieved by the use of illegal additives and

failed to disclose the facts alleged in paragraph 156 of the Complaint (*see supra* at 15–16). *Id.* at ¶ 199.

(2) Defendant Vande Yacht represented that there had been no adverse change in the financial condition or results of operation or business, properties or prospects of Kasson from that shown in the June 30, 1987 financial statements. *Id.* at ¶ 200. This representation was false and misleading because Kasson's liquidity measured by the sum of its cash and unused federal credit on its revolving credit facility declined by more than $500,000 from June 30, 1987 to October 9, 1987. *Id.* at ¶ 201.

(3) Defendant Vande Yacht represented that there had been no event or condition materially and adversely affecting the operations or the business or financial condition of Kasson since June 30, 1987. *Id.* at ¶ 202. This representation was false and misleading because defendant Vande Yacht knew that Kasson had fallen far behind schedule in replacing its molding and brining systems and that Kasson had released the manufacturer of the molding from responsibility for this difficulty. *Id.* at ¶ 203.

(4) Defendant Vande Yacht represented that he knew of no event, happening or fact which would reasonably lead one to the belief that any present supplier or customer of Kasson would terminate or significantly diminish its business relationship with Kasson. *Id.* at ¶ 204. This representation was false and misleading because defendant Vande Yacht knew that the following facts would jeopardize Kasson's relationships with its milk suppliers and customers:

(a) Kasson had failed to notify its milk suppliers, as required by law, of the basis on which it maintained its dairy plant license. As a result, Kasson's milk suppliers did not know that Kasson had been required to post security in 1984 through 1986, that Kasson's financial position was weak and that Kasson had obtained release of the escrow;

(b) Kasson illegally used whey cream in 1987 and casein in 1981 through 1984; and

(c) Kasson had issued false and misleading financial statements since at least 1978 with the assistance of First Wisconsin and Kasson's accountants and had filed such financial statements with the Wisconsin Department of Agriculture.

*Id.* at ¶ 205.

(5) Defendant Vande Yacht represented that Kasson had complied with all applicable laws and regulations governing its business and products for which failure to comply would have a material adverse effect on its property, assets, business or financial condition. *Id.* at ¶ 206. This representation was false and misleading for the reasons stated in the preceding paragraph. *Id.* at ¶ 207.

· First Wisconsin knew that defendant Vande Yacht was making the above misrepresentations. *Id.* at ¶ 208. ·

Finally, defendants Vande Yacht and First Wisconsin made further misrepresentations to Grove and the individual plaintiffs by failing to disclose that:

(1) First Wisconsin's October 31, 1986 purported loan to Kasson was not in substance a loan, or even if it was in substance a loan, it was a current liability; and

(2) Kasson had obtained control of the escrow account at First Wisconsin by filing false and misleading financial statements with the Wisconsin Department of Agriculture.

*Id.* at ¶ 209.

### M. Necessity for Immediate Cash Transfusions by Grove to Prevent Kasson's Failure

After purchasing Kasson, Grove was required to obtain loans in the amount of $2,300,000 and to invest approximately $2,850,000 in Kasson to prevent Kasson, Grove and the WPC and Lactose Partnerships from being forced to cease doing business. *Id.* at ¶¶ 210–220. Nonetheless, on May 2, 1989, Kasson filed for reorganization under Chapter 11 of the Bankruptcy Code. *Id.* at ¶ 221. In 1990, Kasson's action was converted to a liquidation under Chapter 7 of the Bankruptcy Code. *Id.*

Based upon the foregoing factual assertions, plaintiffs allege seven causes of action. The first five are based on state law misrepresentation. The sixth cause of action is a federal RICO claim and the seventh a state RICO claim.

### II. THORNTON'S MOTION TO DISMISS

Plaintiffs' Complaint alleges violations by Thornton of RICO and Wisconsin law governing fraud, negligent misrepresentation, strict liability and racketeering. Thornton argues that plaintiffs' RICO claim suffers several fatal defects and therefore must be struck. Assuming that this Court dismisses plaintiffs' RICO claim, Thornton argues that this Court should also dismiss plaintiffs' state law claims under the doctrine of pendent jurisdiction. Alternatively, if this Court determines that it is proper to review plaintiffs' state law claims on their merits, Thornton argues that, because they suffer from fatal defects, they should be dismissed for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).

#### A. Plaintiffs' RICO Claim

Thornton argues that plaintiffs' RICO claim suffers several fatal defects. In particular, Thornton argues that plaintiffs have failed to allege adequately: (1) a RICO injury proximately caused by Thornton; (2) that Thornton engaged in any racketeering activity; or (3) that Thornton engaged in a pattern of racketeering activity. In addition, Thornton argues that the individual plaintiffs lack standing to assert a RICO claim. As will be demonstrated below, the individual plaintiffs lack standing to assert a RICO claim, and plaintiffs have failed properly to allege that Thornton engaged in any racketeering activity. Accordingly, this Court will dismiss plaintiffs' RICO claim against Thornton.

##### (1) Standing Of Individual Plaintiffs

■ Thornton argues that the individual plaintiffs do not have standing to sue under RICO because the only damage they are alleged to have suffered flows from their guarantee of loans to Grove following

the purchase of Kasson. In support of the assertion that guarantors of a RICO victim have no standing to sue, Thornton cites *Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333 (7th Cir.1989). In *Mid–State,* the Seventh Circuit held that guarantors, like creditors, lack standing to sue under RICO because their injuries are of a derivative and not a direct nature. *See id.* at 1335–1336.

In response, plaintiffs argue that the individual plaintiffs have standing to sue because: (1) it is not certain that a recovery in this case will enable Grove to pay its debt so that the individual plaintiffs will be relieved from the guarantees; (2) the individual plaintiffs have been substantially injured far beyond any amounts they may have to pay by reason of the guarantees and (3) the individual plaintiffs' claims arise from the same nucleus of operative fact as Grove's claims.

Plaintiffs' arguments lack merit. Plaintiffs' first two arguments fail to distinguish this case from *Mid–State.* Plaintiffs do not dispute that the claims of the individual plaintiffs are based on their status as guarantors. Accordingly, under *Mid–State* they lack standing to bring a RICO claim. Plaintiffs' third argument, that the individual plaintiffs' RICO claims arise from the same nucleus of operative fact, does not relate to the individual plaintiffs' standing to sue. Whether claims involve a common nucleus of operative facts may affect whether a court has pendent jurisdiction over related state claims brought by plaintiffs with standing to sue. It does not, however, affect the individual plaintiffs' standing to sue.

### (2) RACKETEERING ACTIVITY

Before a RICO plaintiff can allege a "pattern of racketeering activity," he must plead particular instances of "racketeering activity" or "predicate acts." Acts which qualify as racketeering activity are listed in 18 U.S.C. § 1961(1) and include any act which is indictable under the mail fraud statute (18 U.S.C. § 1341), and "any offense involving ... fraud in the sale of securities ... punishable by any law of the United States." Plaintiffs allege that the defendants committed racketeering activity in the form of "acts of mail fraud and securities fraud." *See* Complaint at ¶ 268.

In order to allege a predicate act of mail fraud or securities fraud, plaintiffs must allege the requisite criminal intent. Moreover, this scienter element must satisfy the particularity requirements of Fed. R.Civ.P. 9(b). *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

Plaintiffs have failed to allege properly criminal intent on the part of Thornton. As plaintiffs note, they allege that Thornton knew or should have known that the misrepresentations were false and that Thornton knew that the investors would rely on those representations. *See* Complaint at ¶¶ 226–227. Paragraph 226 provides:

> Vande Yacht, Bank and Accountants knew or should have known that these misrepresentations were not in accordance with the truth, or did not have the confidence and the accuracy of those misrepresentations that they stated or implied in making such misrepresentations, or knew that they did not have the basis for such misrepresentations that they stated or implied they had.

Paragraph 227 provides:

> Those misrepresentations were made with the intention or expectation that the Investors would act in reliance upon them and it was reasonably foreseeable that the Investors would rely upon them to invest in the financing, construction, ownership and operation of the WPC Project and the Lactose Project, purchase the stock of Kasson and make investments in Kasson (the "Investments").

While Rule 9(b) permits states of mind to be pleaded generally, the rule requires plaintiffs to plead "with particularity" any "circumstances constituting fraud." *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). Assertions that Thornton knew the representations were false and that Thornton knew investors would rely

on those representations are too conclusory to meet the requirements of Rule 9(b). *See Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir.1990).[2]

■ Moreover, while a defendant's mental state need not be pleaded with particularity, "the complaint must still afford a basis for believing the plaintiffs could prove scienter." *DiLeo* at 629. The plaintiffs' Amended Complaint fails to do this. Where "the plaintiff does not have direct evidence of scienter, the court should ask whether the fraud (or cover up) was in the interest of the defendants. Did they gain by bilking the buyers of the securities?" *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986). Here, there are no allegations that Thornton had anything to gain from the fraud committed by the primary violators. Although Thornton apparently received a fee for its services, this is not sufficient to support an inference of scienter. *See Robin* at 1127. As the Seventh Circuit explained in *DiLeo*, an accounting firm's "greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees [an accounting firm receives for its services] ... could not approach the losses [a firm] ... would suffer from a perception that it would muffle a client's fraud." *See DiLeo* at 629.

### B. PENDENT STATE LAW CLAIMS

■ This Court will dismiss plaintiffs' RICO claim against defendant Thornton for failure to state a claim. Defendant Thornton argues that, because plaintiffs admit that the sole basis for this Court's subject matter jurisdiction over their state law claims is pursuant to the doctrine of pendent jurisdiction, *see* Complaint at ¶ 9, these claims must also be dismissed. In support of this argument, defendant Thornton cites *United Mine Workers v. Gibbs,*

383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) and *Graf v. Elgin, Joliet & Eastern Ry.,* 790 F.2d 1341, 1344 (7th Cir.1986). In *Gibbs*, the Supreme Court stated:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188 (1938)]. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (footnotes omitted). Because plaintiffs' federal claims against defendant Thornton will dissolve prior to trial, defendant Thornton argues that it is appropriate for this Court to relinquish its pendent jurisdiction. This Court would agree with defendant Thornton were it not that this cause of action contains viable RICO claims against defendants Vande Yacht and First Wisconsin. *See infra* at 1504–05 and 1509–11. Accordingly, 28 U.S.C. § 1367(a) applies. Section 1367(a) grants this Court supplemental jurisdiction over plaintiffs' state law claims against defendant Grant Thornton since those claims are so related to plaintiffs' RICO claims that they form part of the same case or controversy.[3]

■ Defendant Thornton also argues that this Court should dismiss all of plaintiffs' state law claims because plaintiffs

---

**2.** The *Robin* court stated:

> Assertions that Arthur Young had knowledge that the prospectus was false and misleading and that Arthur Young knowingly and intentionally aided and abetted the primary violators are nothing more than rote conclusions. *Robin* at 1127.

**3.** Section 1367(a) provides in part:

> the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

have failed to allege that defendant Thornton proximately caused plaintiffs' alleged injuries. Defendant Thornton notes that under Wisconsin law, tort liability requires the presence of proximate causation. *See, e.g., Rolph v. EBI Cos.*, 159 Wis.2d 518, 464 N.W.2d 667 (1991). "In Wisconsin, 'legal cause in negligence actions is made up of two components, cause in fact and "proximate cause," or policy considerations.'" *Rolph* at 533, n. 5, 464 N.W.2d 667 (quoting *Morgan v. Pennsylvania General Ins. Co.*, 87 Wis.2d 723, 735, 275 N.W.2d 660 (1979)). Moreover Thornton notes that a finding of nonliability in terms of public policy is a question of law for court determination. *See Morgan* at 737, 275 N.W.2d 660.

In *Coffey v. Milwaukee*, the Supreme Court set forth six factors to be considered in determining whether imposing liability is against public policy:

(1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

74 Wis.2d 526, 541, 247 N.W.2d 132 (1976).

However, the Wisconsin Supreme Court has instructed courts not to limit liability on public policy grounds without a full factual resolution of the claims at trial. *See Schuster v. Altenberg*, 144 Wis.2d 223, 241, 424 N.W.2d 159 (1988). In particular, the Supreme Court has stated that "where the issues are complex or factual connections are attenuated, a full trial must precede the court's determination." *See Hass v. Chicago & North Western Ry Co.*, 48 Wis.2d 321, 326–27, 179 N.W.2d 885 (1970) (cited by *Rolph* at 534, 464 N.W.2d 667). In this case, the factual issues clearly are complex. Accordingly, it is not proper for

this Court to consider defendant Thornton's proximate cause arguments at this point.

Defendant Thornton also raises separate arguments for the dismissal of each of plaintiffs' state law claims against it. This Court will now address those arguments.

(1) *Plaintiffs' Wisconsin Organized Crime Control Act ("WOCCA") Claim*

Defendant Thornton argues that this Court should dismiss plaintiffs' WOCCA claim for the same reasons this Court dismissed plaintiffs' federal RICO claim against it. This Court concurs. As this Court has repeatedly observed, the "requirements for a claim under federal RICO law apply to a claim under the Wisconsin law except where the Wisconsin legislature expressly chose alternative requirements." *See, e.g., City of Milwaukee v. Universal Mortgage Corp.*, 692 F.Supp. 992, 1001 (E.D.Wis.1988). Because WOCCA has similar requirements for pleading "predicate acts" as RICO, this Court's dismissal of plaintiffs' RICO claim against Thornton for failure to properly allege scienter also requires it to dismiss plaintiffs' WOCCA claim against Thornton.

(2) *Common Law Fraud*

A claim for common law fraud requires a plaintiff to plead that:

(1) The defendants made a representation of fact, not opinion; (2) the representation of fact was untrue; (3) the defendants knew the representation was untrue or made it recklessly without caring whether it was true or false; (4) the representation was made with intent to deceive and induce plaintiff to act upon it to plaintiff's damage; and (5) the plaintiff believed such representation to be true and relied on it.

*Heaney v. Associated Bank N.A.*, Case No. 88–C–913 at 44, 1990 WL 446707 (July 11, 1990) (citing *Ludin v. Shimanski*, 124 Wis.2d 175, 184, 368 N.W.2d 676 (1985); Wisconsin Civil Jury Instructions 2401).

As stated above, while Rule 9(b) permits states of mind to be pleaded generally, the rule requires plaintiffs to plead "with particularity" any "circumstances

constituting fraud." Plaintiffs' assertions against Thornton amount to mere conclusory allegations. Moreover, as stated above, plaintiffs' Complaint presents neither direct allegations of scienter nor allegations showing that it was in the interest of defendant Thornton to commit a fraud. Accordingly, for the reasons stated above with respect to plaintiffs' RICO claim, this Court must dismiss plaintiffs' common law fraud claim against defendant Thornton.

### (3) Negligent Misrepresentation

Defendant Thornton next argues that this Court should dismiss plaintiffs' negligent misrepresentation claim against it. While defendant Thornton admits that it is possible for an accountant to be held liable for negligence to a third party not in privity, see Citizens State Bank v. Timm, Schmidt & Co., 113 Wis.2d 376, 335 N.W.2d 361 (1983), Thornton argues that this Court should dismiss plaintiffs' claim because: (1) plaintiffs have failed to plead their reliance on defendant Thornton's work and (2) public policy reasons counsel against imposing liability in this case.

However, at paragraphs 227, 237, 238 and 239 of the Complaint, plaintiffs allege that they reasonably relied on the representations of defendant Thornton when they invested in the financing, construction, ownership and operation of the WPC Project and the Lactose Project, and when they purchased the stock and made investments in Kasson. Accordingly, this Court finds that plaintiffs adequately allege reasonable reliance on the alleged misrepresentations of Thornton.

As stated above, it is not proper for this Court to consider defendant Thornton's arguments regarding public policy at this time. See supra at 1503.

### (4) Strict Liability Misrepresentation

The elements of strict liability misrepresentation are:

(1) that defendant made a representation of fact; (2) that the representation was untrue; (3) that defendant represented the fact from his personal knowledge or was so situated that he either had partic-

ular means of ascertaining the pertinent facts, or his position made possible complete knowledge and his statements fairly implied that he had it; (4) that defendant had an economic interest in the transaction in that defendant stood to make a financial gain if the plaintiff entered it; and (5) that plaintiff believed the representation to be true and relied on it.

Green Spring Farms v. Kersten, 136 Wis.2d 304, 331, n. 13, 401 N.W.2d 816 (1987) (citation omitted). In this case, plaintiffs fail to allege that defendant Thornton had an economic interest in the transactions in question, such that it stood to make a financial gain if plaintiffs entered into them. The plaintiffs argue that defendant Thornton had a financial interest in that it received fees from Kasson for its services. However, this financial benefit does not relate to the economic interest required in the elements of a strict liability misrepresentation claim. To meet the elements of this claim, plaintiffs would have to allege that defendant stood to make a financial gain from plaintiffs' investment in the WPC Project, the Lactose Project and Kasson. Since plaintiff fails to allege facts which adequately indicate that Thornton would receive some sort of bonus if the plaintiffs entered into these transactions, their strict liability misrepresentation claim must fail.

### III. VANDE YACHT'S MOTION TO DISMISS

Defendant Vande Yacht argues that this Court should dismiss plaintiffs' RICO claim against him for the reasons articulated in Thornton's motion to dismiss. Defendant Thornton presents two arguments for the dismissal of plaintiffs' RICO claim which might be applicable to defendant Vande Yacht: (1) that the individual plaintiffs lack standing to sue and (2) that plaintiffs have failed to allege a pattern of racketeering activity.

In addition, Vande Yacht argues that this Court should decline its jurisdiction in this matter pursuant to 28 U.S.C. § 1367(c) and the Colorado River doctrine.

## A. STANDING OF INDIVIDUAL PLAINTIFFS

The individual plaintiffs' RICO claims against Mr. Vande Yacht also arise from their guarantee of loans to Grove. Accordingly, Thornton's argument regarding the individual plaintiffs' standing applies to their RICO claims against Mr. Vande Yacht and calls for the dismissal of these claims.

## B. PATTERN OF RACKETEERING ACTIVITY

In a civil RICO action, a plaintiff must prove that a defendant engaged in a "pattern of racketeering activity." 18 U.S.C. § 1962(a)-(c). In its definitional section, the statute simply states that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity" occurring within a ten-year period. *Id.* § 1961(5). In footnote 14 to *Sedima, SPRL v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) the Supreme Court attempted to put some flesh on this skeletal definition. The Court advised that there must be "continuity plus relationship" among the various acts of racketeering activity to constitute a pattern. *Sedima* at 496 n. 14, 105 S.Ct. at 3285 n. 14.

 The Seventh Circuit has directed district courts to consider a number of relevant factors in determining whether a pattern exists. These factors include "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986).

 In this case, the above factors indicate that plaintiffs have alleged the existence of a pattern of racketeering activity. First, plaintiffs allege a large number of predicate acts over a time period from September 1977 through October 1987. Second, plaintiffs allege that such racketeering activity deceived and injured Kasson's trade creditors, purchasers of its products, the FmHA, the SBA and the Wisconsin Department of Agriculture and plaintiffs' predecessors in addition to plaintiffs. Third, plaintiffs allege a wide variety of separate schemes by defendants. Finally, plaintiffs allege distinct and separate injuries to the various victims of defendants' actions.

In spite of the above, defendants argue that this Court should find that plaintiffs fail to allege a pattern of racketeering activity because the only alleged resulting injury was that to plaintiffs upon its purchase of Kasson. In support of this assertion, defendants cite *SK Hand Tool Corp. v. Dresser Industries, Inc.,* 852 F.2d 936 (7th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989). In *SK Hand Tool,* the Seventh Circuit held that the defendants' misrepresentations could not fairly be viewed as constituting separate transactions since they did not have any effect on the plaintiff until it decided to purchase a division from defendant. *See id.* at 940. The *SK Hand Tool* court noted that plaintiffs could not identify any additional schemes performed by the defendants or any additional victims hurt by the defendants' activities. *See id.* at 941–942. The *SK Hand Tool* plaintiffs attempted to argue that two schemes existed: The first scheme, executed by division employees, deceived defendant's officers and directors and the second, executed by defendant to sell the division at an inflated price, defrauded plaintiff. *See id.* at 941. The Seventh Circuit declined to consider the defendant as both a victim and perpetrator of the fraud. *See id.* The court declined because "the primary purpose of RICO is to 'reach those who ultimately profit from racketeering, not those who are victimized by it.' " *See id.* (quoting *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 402 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985).

In this case, like *SK Hand Tool,* plaintiffs' injury did not occur until after plaintiffs purchased Kasson. However, unlike *SK Hand Tool,* plaintiffs allege several distinct instances of fraudulent activity by defendants and that the activity resulted in injuries to several victims. Accordingly, even though it appears that the plaintiffs' only injury may have been due to their purchase of Kasson, plaintiffs allege suffi-

cient activity by defendants to constitute a "pattern."

### C. 28 U.S.C. § 1367

Defendant Vande Yacht next argues that this Court should decline to exercise its supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367. Section 1367(a) provides in part that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

Mr. Vande Yacht notes that under § 1367(c), a district court may decline to exercise supplemental jurisdiction if: "(1) the claim raises a novel or complex issues of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Mr. Vande Yacht, however, fails to demonstrate how the plaintiffs in this action fall within any of the four above categories. Accordingly, this Court will deny his request to dismiss plaintiffs' causes of action pursuant to § 1367.[4]

### D. COLORADO RIVER

■ Finally, plaintiff Vande Yacht argues that this Court should decline jurisdiction under the *Colorado River* doctrine. In *Colorado River Water Conservation District v. United States*, the Supreme Court created an extraordinary exception to the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). The doctrine allows federal courts to stay or dismiss actions in deference to parallel

and ongoing state proceedings in circumstances where the abstention doctrines do not apply. *Medema v. Medema Builders, Inc.*, 854 F.2d 210, 212 (7th Cir.1988).

■ In an effort to maintain a narrow exception, the *Colorado River* court set out a two-prong test. The threshold inquiry is whether the cases are "parallel." *See Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1287 (7th Cir.1988). A case is parallel to another if " 'substantially the same parties are contemporaneously litigating substantially the same issues in another forum.' " *Id.* at 1288 (quoting *Calvert Fire Ins. Co. v. American Mut. Reinsurance Co.*, 600 F.2d 1228, 1229 n. 1 (7th Cir.1979)).

Here, the state court action and this action are not "parallel" because this action involves substantially different factual and legal issues than those in the state court action. Plaintiffs' state court action only involves certain alleged misrepresentations made to them in connection with the sale of Kasson to Grove. In this action, plaintiffs also allege: (1) since 1976, Vande Yacht and First Wisconsin had been deceptively structuring First Wisconsin's loans to Kasson to create the appearance that Kasson was meeting the financial soundness requirements imposed by the Wisconsin Department of Agriculture; (2) due to the deceptive loan structuring and for other reasons, since 1976, Kasson's financial statements have been false and misleading; (3) several misrepresentations by the defendant induced plaintiffs to make investments in a whey protein processing plant and a lactose processing plant before Grove purchased Kasson. These additional allegations have allowed plaintiffs to allege federal and state RICO claims. If this Court were to defer to the state court action, it would force plaintiffs to make substantial amendments to their state court complaint, causing substantial delay in that action.

---

**4.** This Court will discuss § 1367(c) in greater detail in addressing defendant First Wisconsin's

motion to dismiss.

The second part of the *Colorado River* analysis is a multi-factor balancing test.[5] *Medema* at 213 (citing *Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1246–47). The Seventh Circuit has noted ten factors that are relevant to this inquiry. *Medema* at 213. "No one factor is necessarily determinative." *Colorado River* at 818, 96 S.Ct. at 1247. However, the balance is "heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983).

The ten factors identified by the Seventh Circuit are: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forum; (5) the source of governing law, state or federal; (6) the adequacy of the state court to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal and (10) the vexatious or contrived nature of the federal claim. *Lumen Construction, Inc. v. Brant Construction Co.*, 780 F.2d 691, 694–95 (7th Cir.1985). These factors generally support the denial of defendant Vande Yacht's motion.

### (1) WHETHER THE STATE HAS ASSUMED JURISDICTION OVER PROPERTY

The Circuit Court of Milwaukee County has not acquired jurisdiction over any property in the case before it. Accordingly, this factor weighs against deference to the state court action.

### (2) THE INCONVENIENCE OF THE FEDERAL FORUM

This Court sees little inconvenience to defendants in trying this matter in federal court since both the state court action and this action will be adjudicated in the City of Milwaukee.

### (3) THE DESIRABILITY OF AVOIDING PIECEMEAL LITIGATION

Because the federal action involves substantial additional factual and legal issues, a stay of the federal case would not aid the goal of avoiding piecemeal litigation. Moreover, defendant Vande Yacht has pointed to no "clear federal policy ... [supporting the] avoidance of piecemeal adjudication" of the types of claims in this and the state court action. *See Moses H. Cone*, 460 U.S. at 16, 103 S.Ct. at 937 (citing *Colorado River*, 424 U.S. at 819, 96 S.Ct. at 1247). Accordingly, this factor does not weigh in favor of a stay.

### (4) THE ORDER IN WHICH JURISDICTION WAS OBTAINED

Plaintiffs commenced the state court action about seventeen months before they filed this case. This time differential, at first glance, appears to support defendant Vande Yacht's motion. However, because a stay of this action would require plaintiffs substantially to amend their state court complaint, granting defendant Vande Yacht's motion would not aid in the efficient adjudication of these matters. Accordingly, this Court declines to find that this factor supports granting of defendant Vande Yacht's motion.

### (5) THE SOURCE OF GOVERNING LAW, STATE OR FEDERAL

This case contains a substantial RICO claim. However, that RICO claim is based upon the alleged fraudulent actions of the defendants. In addition, this case contains separate state claims. Given the mixed nature of the claims before this Court, this Court cannot find that the primary source of the governing law is either federal or state. Accordingly, this factor neither favors nor weighs against defendant Vande Yacht's motion.

### (6) THE ADEQUACY OF THE STATE COURT ACTION TO PROTECT THE FEDERAL PLAINTIFF'S RIGHTS

Because plaintiffs' state court action differs substantially from this action, the

---

5. Because defendant Vande Yacht fails under the threshold inquiry, this Court need not address the second part of the *Colorado River* test. In the interest of completeness, however, this Court will briefly discuss this part.

state court action, as presently pleaded, would not adequately protect plaintiffs' rights.

#### (7) THE RELATIVE PROGRESS OF THE STATE AND FEDERAL PROCEEDINGS

Because a stay of this action would require substantial amendment to plaintiffs' state court complaint and presumably a significant extension of·discovery in that case, this Court cannot find that the "state court proceeding has progressed considerably further than the federal case." *See Lumen* at 696.

#### (8) THE PRESENCE OR ABSENCE OF CONCURRENT JURISDICTION

This factor is neutral because federal and state courts have concurrent jurisdiction over RICO actions. *See Tafflin v. Levitt*, 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).

#### (9) THE AVAILABILITY OF REMOVAL

■ This factor applies where a defendant could have availed himself of a federal forum by removing the state court action, but instead filed a second action. *See Microsoftware Computer Systems v. Ontel Corp.*, 686 F.2d 531, 537 (7th Cir.1982). Since plaintiffs, not defendants, commenced the state court action, this factor is not applicable to the case.

#### (10) THE VEXATIOUS OR CONTRIVED NATURE OF THE FEDERAL CLAIM

As shown above, plaintiffs' RICO claim against defendant Vande Yacht is not contrived. Moreover, plaintiffs have demonstrated a desire to avoid vexatious litigation by filing in the state court action a "Motion to Dismiss their Claims against Defendants and to Stay Litigation Concerning Defendants' Counterclaim."

### IV. FIRST WISCONSIN'S MOTION TO DISMISS

First Wisconsin makes four basic arguments in support of its motion to dismiss: (1) plaintiffs' Complaint violates the pleading requirements of Fed.R.Civ.P. 8(a), (e); (2) this Court should decline to exercise

pendent jurisdiction pursuant to the provisions of 28 U.S.C. § 1367; (3) plaintiffs' federal RICO claim must be dismissed pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6); and (4) plaintiffs' additional state law claims must be dismissed.

#### A. RULE 8(A) AND (E)

■ Rule 8(a) and (e) provide in part: (a) *Claims for Relief.* A pleading which sets forth a claim for relief, ... shall contain ... a short and plain statement of the claim. . . .

(e) *Pleading to be Concise and Direct* ... Each averment of a pleading shall be simple, concise, and direct.

First Wisconsin argues that, because sections of plaintiffs' Complaint are unclear, pursuant to· Fed.R.Civ.P. 12(e), this Court should require plaintiffs to file a more definite statement.

In support of its argument that plaintiffs' Complaint fails to meet the requirements of Rules 8(a) and (e), First Wisconsin first notes the length of the pleading and its "repeated allegations of deception dating back to the early 1970's." Given the complex nature of plaintiffs' RICO claim, this Court cannot find that the length of the Complaint, standing alone, shows that plaintiffs violated Rule 8(a) and (e). Moreover, since RICO requires that a plaintiff demonstrate a pattern of activity, this Court cannot find that plaintiffs' "repeated allegations of deception dating back to the early 1970's" violate the principles of Rule 8(a) and ·(e).[6]

#### B. 28 U.S.C. § 1367

Supplemental jurisdiction in federal courts, for all actions filed after December 1, 1990, is governed by the provisions of 28 U.S.C. § 1367. Section 1367(c) permits district courts to decline supplemental jurisdiction for state claims if:

(1) the claim raises a novel or complex issue of State law,

---

**6.** First Wisconsin also criticizes plaintiffs's Complaint for failing to state with specificity its

misrepresentation allegations. This Court will address this criticism·below.

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

First Wisconsin argues that this Court should dismiss plaintiffs' state law claims pursuant to § 1367(c)(1), (2) and (4).

### (1) SECTION 1367(c)(1)

 First Wisconsin argues that plaintiffs' state law claims for intentional misrepresentation, strict liability, misrepresentation, negligent misrepresentation, state RICO and declaratory judgment present complex issues of state law. First Wisconsin states that the issue of when and under what circumstances a lender may be liable to a borrower for damages under theories like those advanced by plaintiffs has never been addressed under Wisconsin law. It states that an analysis of those issues would force this Court to create state law. However, as plaintiffs note, the elements of plaintiffs' misrepresentation claims are well established under Wisconsin law. First Wisconsin points to no legal authority demonstrating that the lender should not be subject to those claims. Accordingly, this Court sees no real complexity or novelty to the state law issues in this case which would counsel this Court to decline jurisdiction over plaintiffs' state law claims.

### (2) SECTION 1367(c)(2)

 First Wisconsin next argues that the underlying state law claims are the core of this Complaint. First Wisconsin notes that without plaintiffs' allegations of fraud, there could be no RICO claim. However, the fact that plaintiffs' RICO claim is based on state law claims does not counsel for the dismissal of these state law claims. In contrast, plaintiffs' basis of their RICO claim on allegations of state law misrepresentation demonstrates the relatedness of the matters and the appropriateness of this Court addressing both the

RICO and the state law claims in one action.

### (3) SECTION 1367(c)(4)

 Finally, First Wisconsin argues that this Court should dismiss the state law claims because plaintiffs have engaged in a multiplication of litigation and forum shopping. However, as stated above, plaintiffs have moved to dismiss this claim in state court. *See supra* at 3. Accordingly, this Court fails to see how plaintiffs, by filing of this suit, have increased litigation or engaged in any improper forum shopping.

### C. RICO CLAIM DISMISSED PURSUANT TO RULES 9(b) and 12(b)(6)

In addition to arguing that the individual plaintiffs lack standing to bring a RICO claim, First Wisconsin argues that this Court should dismiss the plaintiffs' RICO claim against it for four reasons: (1) plaintiffs have failed to plead injury to business or property; (2) plaintiffs have failed to show proximate cause; (3) plaintiffs have failed to demonstrate the existence of racketeering "acts"; and (4) plaintiffs have failed to demonstrate a "pattern" of racketeering activity.

### (1) STANDING OF INDIVIDUAL PLAINTIFFS

The individual plaintiffs' RICO claims against First Wisconsin also arise from their guarantee of loans to Grove. Accordingly, Thornton's argument regarding the individual plaintiffs' standing applies to their RICO claims against First Wisconsin and calls for a dismissal of these claims.

### (2) INJURY TO BUSINESS OR PROPERTY

 First Wisconsin first argues that plaintiffs have failed to plead an injury to their business or property. However, plaintiffs allege in their Complaint that they were injured due to their purchase of a company whose worth was artificially inflated by the actions of defendants. Accordingly, the Court finds that this argument lacks merit.

### (3) PROXIMATE CAUSE

 First Wisconsin next argues that plaintiffs cannot demonstrate First Wiscon-

sin's acts were a proximate cause of their injuries. The Seventh Circuit has interpreted RICO's "by reason of" language to require plaintiffs to show "that the criminal conduct that violated RICO ... proximately caused their injury." *See Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 (7th Cir.1989) (citing *Haroco v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Brandenburg v. Seidel*, 859 F.2d 1179, 1189 (4th Cir.1988)). In *Brandenburg*, the Fourth Circuit noted:

> Such a cause-in-fact connection, standing alone, does not suffice to establish liability. Civil RICO is of course a statutory tort remedy—simply one with particularly drastic remedies. Causation principles generally applicable to tort liability must be considered applicable. These require not only cause-in-fact, but "legal" or "proximate" cause as well, the latter involving a policy rather than a purely factual determination: "whether the conduct has been so significant and important a cause that the defendant should be held responsible." Prosser and Keeton *Torts*, § 42 p. 272 (general principle) (5th ed. 1984); *see also id.* § 110 p. 767 (applicable in fraud cases); *Restatement (Second) of Torts*, § 548A (legal cause required in fraud cases). As such, the legal cause determination is properly one of law for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection. *See generally Restatement (Second) of Torts* § 548A comments a, b.

*Brandenburg* at 1189 (footnote omitted). First Wisconsin argues that plaintiffs have failed to meet the requirements of proximate cause because of the intervention of two independent causes. First Wisconsin notes that plaintiffs admit that they retained and relied upon two independent sources of information to evaluate the Kasson transaction. The WPC Partnership engaged: (1) Robert W. Baird & Company, Inc. ("Baird") to render an appraisal of the

fair market value of the stock of Kasson and (2) Myron Dean to perform an analysis of Kasson's operations. Complaint at ¶ 170.

In response to First Wisconsin's argument, plaintiffs note that they allege at ¶¶ 173 and 174 of the Complaint that defendants' misrepresentations were passed on to Baird and Dean when they performed their analyses. Plaintiffs also allege that defendants were aware that plaintiffs were relying on the opinions of Dean and Baird in deciding whether to enter into the transaction with Kasson. *See, e.g.,* ¶ 184. Because defendant First Wisconsin has failed to point to an independent intervening cause in the allegations of plaintiffs' Complaint, this Court finds that it is not proper to dismiss plaintiffs' RICO claim against it on this ground.

### (4) RACKETEERING ACTS

First Wisconsin argues that plaintiffs failed fully to allege fraudulent intent on the part of First Wisconsin. First Wisconsin notes that "[a]lthough intent may be averred generally, plaintiff must provide a factual basis that gives rise to a 'strong inference' that defendants possessed the requisite fraudulent intent in the committing of the alleged acts of ... fraud." *See Heaney v. Associated Bank*, No. 88–C–913, 1990, U.S.Dist. LEXIS 17317 Slip Op. at 17 (E.D.Wis. July 11, 1990) (citing *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49–50 (2d Cir.1987)). In *Beck*, the Second Circuit noted that, although Rule 9(b) provides that intent and "other conditions of mind" may be averred generally, a plaintiff must nonetheless provide some factual basis for conclusory allegations of intent. *See id.* at 50. The *Beck* court noted two methods of establishing a strong inference of scienter. First, plaintiffs allege facts showing a motive for committing fraud and a clear opportunity to do so. *See id.* Second, where motive is not apparent, plaintiffs may still plead scienter by identifying circumstances indicating conscious behavior by the defendant.

In their Complaint, plaintiffs allege both (1) facts showing a motive for committing fraud and a clear opportunity to do so and

(2) specific circumstances indicating conscious behavior on the part of First Wisconsin to engage in fraudulent acts. First, plaintiffs allege that First Wisconsin took advantage of repeated opportunities to engage in fraudulent loans in order to help Kasson eliminate its trusteeship and thereby position First Wisconsin to earn high profits at low risk by making loans to Kasson which were guaranteed by the FMHA and/or the SBA. *See* Complaint at ¶ 21. Second, plaintiffs allege specific circumstances indicating conscious behavior on the part of First Wisconsin. Plaintiffs' Complaint sets forth in detail First Wisconsin's involvement in several similar transactions in which the Bank made a loan to Kasson immediately before Kasson's financial statements were issued to enable Kasson to misrepresent its financial condition. *See, e.g.,* Complaint at ¶¶ 32–39. Plaintiffs' allegations regarding the timing and terms of payment of these loans indicate conscious behavior on the part of First Wisconsin to misrepresent Kasson's financial condition.

### (5) PATTERN

The Court has addressed and dismissed the defendants' argument with respect to pattern of activity. *See supra* at 1502–03. This Court need not address this issue further.[7]

### D. PENDENT STATE LAW CLAIMS

First Wisconsin argues that this Court should dismiss plaintiffs' pendent state law claims for two reasons: (1) the misrepresentation claims fail to comply with the provisions of Rule 9(b); and (2) plaintiffs' tort claims fail to state a cognizable claim under Wisconsin law.

### (1) RULE 9(b)

■ Rule 9(b) provides that allegations of misrepresentation must be pleaded with specificity. As the Court stated in *McKee v. Pope Ballard Shepard & Fowle Ltd.,* 604 F.Supp. 927, 930–31 (N.D.Ill.1985) (citations omitted):

> At the least, a plaintiff pleading fraud must "specify the time, place and contents of any alleged false representations, and the full nature of the transaction." This should include the identity of the person making the misrepresentations, and how the misrepresentations were communicated to the plaintiff.... The identity of those making the misrepresentations is crucial. Courts have been quick to reject pleadings in which multiple defendants are "lumped together" and in which no defendant can determine from the complaint which of the alleged misrepresentation it is specifically charged with having made, nor the identity of the individual by whom and to whom the statements were given, nor the situs and circumstances of the conversation, nor ... the date of the utterance.

Several of the allegations in plaintiffs' Complaint failed to specify the time, place and contents of the alleged false representations as well as the individual alleged to have made the representation and the individual to whom the statements were made. *See* Complaint at ¶¶ 117, 127, 128, 154, 194 and 222. In addition, with respect to certain representations, plaintiffs failed to allege whether the statements were false. *See, e.g.,* Complaint at 110. This Court will order plaintiffs to file an amended complaint which rectifies these problems.

### (2) TORT CLAIM

■ First Wisconsin next argues that plaintiffs' tort claims alleged in the first,

---

**7.** First Wisconsin also argues that plaintiffs have not adequately pleaded "control" and that therefore their RICO claim against First Wisconsin must be dismissed. In support of this argument, First Wisconsin cites *NCNB Nat. Bank of North Carolina v. Tiller,* 814 F.2d 931, 936 (4th Cir.1987). In *NCNB,* the plaintiffs contended that "NCNB violated 18 U.S.C. § 1962(b) (1984) by acquiring and maintaining control of both Southern and Williamson through either a pattern of racketeering activity or the collection of

an unlawful debt." *See id.* The Fourth Circuit upheld "the district court's dismissal of this claim because plaintiffs were unable to present any evidence which showed that NCNB had control over the operations of the corporation." *See id.* The holding in NCNB is inapplicable to this case since plaintiffs do not allege that First Wisconsin acquired or maintained control of Kasson through either a pattern of racketeering activity or the collection of an unlawful debt.

**1512**

second, third and fourth causes of action fail to state a cognizable claim under Wisconsin law. First Wisconsin notes that plaintiffs' first, second, third and fourth causes of action rely on tort theories, i.e., intentional, negligent and strict liability misrepresentation, while at the same time alleging that the parties entered a contract or contracts. First Wisconsin argues that, under Wisconsin law, only contract remedies are available where a party has pleaded the existence of a contract. In support of this argument, First Wisconsin cites *First Nat'l Bank and Trust Co. of Racine v. Notte,* 97 Wis.2d 207, 293 N.W.2d 530 (1980). However, in *Notte,* the Wisconsin Supreme Court merely held that the trial court inappropriately applied tort principles because "[f]rom the defendant's answer it is apparent that he was attempting to avoid liability on the contract; not assert a claim for damages based on tort principles." *See id.* at 212. In contrast to First Wisconsin's assertions, the *Notte* court did not hold that a party may not pursue tort remedies merely because a contract exists between the parties. Moreover, both the Wisconsin Supreme Court and the Seventh Circuit have permitted plaintiffs to recover tort damages in spite of the existence of a contractual relationship between the parties. *See Lundin v. Shimanski,* 124 Wis.2d 175, 368 N.W.2d 676 (1985); *Western Industries, Inc. v. Newcor Canada Ltd.,* 739 F.2d 1198, 1206 (7th Cir.1984).

### V. SUMMARY

Under the foregoing reasoning, this Court:

(1) GRANTS IN PART and DENIES IN PART defendant Thornton's motion to dismiss. This court GRANTS defendant Thornton's motion to dismiss the plaintiffs' RICO and WOCCA claims, common law fraud and strict liability misrepresentation claims. However, this Court DENIES defendant Thornton's motion to dismiss plaintiffs' negligent misrepresentation claim.

(2) GRANTS IN PART and DENIES IN PART defendant Vande Yacht's motion to dismiss. This Court GRANTS defendant Vande Yacht's motion to dismiss the RICO claim of the individual plaintiffs. However, this Court DENIES the remainder of defendant Vande Yacht's motion to dismiss; and

(3) GRANTS IN PART and DENIES IN PART defendant First Wisconsin's motion to dismiss. This Court GRANTS First Wisconsin's motion to dismiss the RICO claim of the individual plaintiffs. This Court DENIES defendant First Wisconsin's motion with respect to the remaining claims. However, this Court ORDERS plaintiffs to file an amended complaint consistent with this Order.

SO ORDERED.