**MARYLAND STAFFING SERVICES, INC., John Chandonnet, Nancy Chandonnet, Plaintiffs,**

v.

**MANPOWER, INC., Mitchell S. Fromstein, Jon F. Chait, Terry A. Hueneke, Douglas H. Krueger, James J. Katte, Joseph Long, Milt Berland, Gil Palay, John Does 1–4, et al., Defendants.**

No. 95–C–1315.

United States District Court, E.D. Wisconsin.

Aug. 19, 1996.

Eric J. Szoke, Monica & Szoke, Far Hills, NJ, for Plaintiffs.

William H. Levit, Jr., Godfrey & Kahn, Milwaukee, WI, for Defendants.

## DECISION AND ORDER

WARREN, District Judge.

This case involves a commercial dispute over the appropriate rates of insurance to be charged by a franchisor to a franchisee. In crafting their lawsuit against the defendants, the plaintiffs have chosen the shotgun approach; they have filed an 84–page, 231–paragraph, nineteen-count complaint. A rifle would have provided a better model. *See Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 955 (7th Cir.1996). The defendants might have moved to dismiss the entire prolix complaint on the ground that it fails to include a "*short and plain* statement of the claim showing the pleader is entitled to relief" as required by Federal Rule 8(a)(2). *See Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 775–76 (7th Cir. 1994). Instead, they have chosen a more narrowly focused approach and have asked the Court to dismiss each and every count of the complaint for reasons specific to each. For the reasons that follow, the defendants' motion will be granted in part and denied in part, and Counts 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, and 19 of the complaint will be dismissed.

## I. BACKGROUND

According to the complaint, plaintiff Maryland Staffing Services, Inc. (Maryland Staffing) entered into a franchise agreement with defendant Manpower, Inc. (Manpower) in 1974. Under the terms of this agreement (which was renewed in 1976, 1978, 1984 and 1994), Maryland Staffing was given exclusive rights to use the corporate name and resources of Manpower and to engage in the business of providing temporary workers to customers under the corporate authority of Manpower in the State of Maryland.

Manpower compensated Maryland Staffing by paying it a percentage of Maryland Staffing's gross profit. The franchise agreement provides that gross profit is to be calculated by deducting certain expenses from Maryland Staffing's total monthly sales. Among these expenses are the costs of all necessary employer liability and workers' compensation insurance coverage for Maryland Staffing's temporary workers. (Franchise Agreement ¶ 5a.) According to the terms of the agreement, Manpower was obligated to provide the funds for this insurance coverage. (Franchise Agreement ¶ 3i.) Manpower then deducted the costs of this insurance from the total sales of Maryland Staffing as part of determining Maryland Staffing's gross profit.

The complaint alleges that beginning in 1987, Manpower began overcharging Maryland Staffing for workers compensation and liability insurance. Thus, the plaintiffs allege, Manpower wrongfully reduced Maryland Staffing's compensation by artificially raising its expenses and thus reducing its gross profit.

On December 27, 1995, the plaintiffs filed this suit asserting nineteen separate causes of action. They assert that Manpower and its employees violated the Racketeer Influenced and Corrupt Organizations Act (RICO), violated federal and state antitrust laws, violated Wisconsin and Maryland franchising laws, and breached numerous common law duties. On February 26, 1996, the defendants filed this motion seeking to dismiss all of the plaintiffs' claims for various deficiencies. The motion is now fully-briefed and ready for resolution.

## II. LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a district court to dismiss a claim for "failure to state a claim upon which relief can be granted." In evaluating a motion filed under this rule, the Court must accept as true all well-pleaded factual allegations contained in the plaintiffs' complaint and must draw all reasonable inferences in favor of the plaintiffs. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Baxter Healthcare Corp. v. O.R. Concepts, Inc.,* 69 F.3d 785, 787 (7th Cir.1995); *Janowsky v. United States,* 913 F.2d 393, 395 (7th Cir. 1990). The Court must deny a motion to dismiss unless it appears beyond doubt that the plaintiffs are unable to prove any set of facts which would entitle them to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Baxter Healthcare,* 69 F.3d at 787.

## III. DISCUSSION

### A. Standing of Individual Plaintiffs.

The defendants first move to dismiss the claims of individual plaintiffs John and Nancy Chandonnet, the owners and officers of Maryland Staffing, on the ground that they lack standing to pursue these claims.

"As a general principle, a corporate shareholder does not have an individual right of action against third persons for damages to the shareholder resulting indirectly from injury to the corporation." *Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989). *See also Twohy v. First Nat. Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985). There are certain exceptions to this general rule, "such as where a special contractual duty exists between the wrongdoer and shareholder or where the shareholder suffers an injury separate and distinct from that suffered by other shareholders." *Twohy,* 758 F.2d at 1194 (citations omitted).

The plaintiffs claim that the Chandonnets fit within this latter exception; they claim to have suffered numerous injuries independent from those suffered by the corporation, Maryland Staffing. According to the

plaintiffs, "In every count of the complaint, the individual Plaintiffs allege personal pain, suffering, humiliation, emotional distress and mental anguish. These claims arise from mental and physical injuries sustained by the individual plaintiffs as a result of the Defendants' alleged conduct." (Plaintiffs' Brief in Opposition to Defendants' Motion at p. 8.)

The Court rejects the plaintiffs' characterization and concludes that the injuries alleged by the individual plaintiffs are not separate and distinct from those suffered by the corporation. The individual plaintiffs' alleged injuries are derivative of the alleged injuries to Maryland Staffing; the complaint alleges that the individual plaintiffs suffered mental and physical injuries as a result of the financial damages incurred by the corporation. Obviously investors in a firm suffer when the firm incurs a loss, "yet only the firm may vindicate the rights at issue." *Flynn*, 881 F.2d at 449 (quoting *Carter v. Berger*, 777 F.2d 1173, 1175 (7th Cir.1985)). As was the case in *Flynn*, here "[i]t is clear that the alleged injury is an injury to the corporation—an injury to the shareholders was an indirect result of the damage done to the corporation as such, it does not create the necessary direct and independent harm required to maintain shareholder standing." *Flynn*, 881 F.2d at 449. Maryland Staffing is the only party authorized to vindicate its rights vis a vis Manpower. Accordingly, the defendants' motion will be granted in this regard, and the Chandonnets' claims will be dismissed.

### B. Plaintiffs' RICO Claims.

■ To state a claim upon which relief can be granted under RICO, 18 U.S.C. § 1962(c), plaintiffs must allege that the defendants (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

The defendants move to dismiss the plaintiffs' RICO claims (Counts 1, 2, 6, and 7) because the plaintiffs have failed to adequately allege the third and fourth elements of the RICO cause of action.[1]

### 1. Racketeering activity.

"Before a RICO plaintiff can allege a 'pattern of racketeering activity,' he must plead particular instances of 'racketeering activity' or 'predicate acts.' " *Grove Holding v. First Wisconsin Natl. Bank*, 803 F.Supp. 1486, 1501 (E.D.Wis.1992). Here, the plaintiffs allege mail and wire fraud by the defendants as the predicate acts of racketeering activity to support their RICO claims.

■ In order to establish mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, the plaintiffs must ultimately prove (1) that the defendants devised a scheme to defraud the plaintiffs; (2) that the defendants used the United States mails or caused interstate wire communications to take place for the purpose of executing that scheme; and (3) that the defendants did so knowingly and with the intent to defraud. *See Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954); *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). The defendants claim that the complaint fails to adequately allege these elements because it fails to allege that the defendants acted with the requisite intent to defraud and because it fails to allege fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

### a. Intent to defraud.

In order to adequately allege mail or wire fraud as RICO predicate acts, the plaintiffs must plead scienter; they must allege that the defendants intentionally deceived the plaintiffs. *See Grove Holding*, 803 F.Supp. at 1501. In support of their motion to dis-

---

1. The defendants also move to dismiss the plaintiffs' RICO claims on the ground that they are barred by the applicable statute of limitations. The Court rejects this argument, and concludes that the plaintiffs filed this action within the four-year statute of limitations applicable to RICO claims. *See Agency Holding Corp. v. Malley–Duff & Associates*, 483 U.S. 143, 156, 107 S.Ct. 2759,

2767, 97 L.Ed.2d 121 (1987) (four-year statute of limitations applies to RICO claims). The plaintiffs did not discover (nor did they have reason to discover) the alleged insurance overcharges until 1994; they filed their complaint in 1996. *See McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464–65 (7th Cir.1992).

miss, the defendants claim that "Maryland Staffing does not allege that any one of the individual defendants possessed the requisite scienter. Rather, it simply claims that, by virtue of their positions with Manpower, one or more of the defendants ... knew Manpower was overcharging for insurance." (Memorandum of Defendants at p. 8.) Therefore, according to the defendants, the "Complaint does not allege which defendant(s) allegedly had the necessary criminal intent. Thus, it does not afford a basis for believing that Maryland Staffing could prove scienter on the part of any of the individual defendants." (*Id.*) In response, the plaintiffs claim that the complaint does allege "knowledge on the part of the Defendants as to the fraudulent and/or misleading nature of the mailings, and [has] identified the source of this knowledge, namely the Defendants' participation in the decision to issue the burden rate notifications." (Plaintiffs Brief in Opposition at p. 13.)

■ Based upon our review of the complaint, we conclude that the plaintiffs have adequately alleged that the defendants acted with the requisite intent to defraud. Although their claims of intent to defraud are broad and nonspecific, under Rule 9(b) of the Federal Rules, "intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). This is only fair; the plaintiffs cannot be expected to know the defendants' state of mind until they have an opportunity to conduct pretrial discovery. *See Emery v. American General Finance, Inc.,* 71 F.3d 1343, 1347 (7th Cir. 1995). The plaintiffs have generally averred intent to defraud and have thus satisfied this requirement. Accordingly, the court concludes that failure to plead scienter with greater specificity does not provide a basis for dismissing these RICO counts.

### b. Federal Rule 9(b) particularity.

■ Rule 9(b), however, does require a RICO plaintiff who relies on mail and wire fraud as predicate acts to plead the circumstances constituting the alleged fraud "with particularity." Fed.R.Civ.P. 9(b). Particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Moreover, "the caselaw and commentary agree that the reference to 'circumstances' in the rule requires 'the plaintiff to state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." ' " *Vicom,* 20 F.3d at 777 (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir. 1992)) (and in turn quoting *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)). In a case such as this where there are multiple defendants, Rule 9(b) prohibits "lumping together" all the defendants under a general accusation that they were participants in a scheme to defraud. Rather, the rule requires that the complaint inform each defendant of the nature of his alleged participation in the fraud and specify which defendants were involved in what activity. *See id.* at 778 (citations omitted).

The defendants argue that the complaint fails to set forth the particulars of the alleged misrepresentations (who made them, when they were made, what the misrepresentations were etc.). Instead, claim the defendants, the complaint merely alleges that one or more of the individual defendants made the decision to overcharge Maryland Staffing for insurance, and that one or more of the defendants knew of the overcharges. The plaintiffs dispute this, arguing (without citing specific paragraphs of the complaint) that the "complaint identifies every relevant aspect of the alleged fraud in great factual detail." (Brief in Opposition at p. 16.)

■ Upon careful review of the complaint, the Court concludes that the plaintiffs have not pleaded the circumstances constituting the alleged fraud with the particularity required by Rule 9(b). The complaint alleges that Manpower concocted a scheme to defraud Maryland Staffing by overcharging it for insurance. It does not indicate who made that decision, when the decision was made, or any of the circumstances surrounding the alleged scheme. Rather, the complaint sim-

ply reiterates the generic allegation that one or more of the individual defendants and/or unknown individuals within their control either made the decision or participated in the process by which the decision to execute the alleged scheme was made. These broad, general allegations fail to provide any of the defendants with notice of the nature of their participation in the alleged scheme. The complaint fails to indicate who did what, when, or where. As such, it is insufficient to satisfy Rule 9(b). Accordingly, the plaintiff's RICO claims will be dismissed on this basis.

### 2. Pattern of Racketeering Activity.

In addition to challenging the RICO counts for their failure to adequately allege racketeering activity, the defendants also move to dismiss these claims for failure to allege that the racketeering activity amounted to a pattern. Specifically, the defendants argue that "the Complaint alleges one victim and one scheme which allegedly took place over an unidentified period of time, on an unidentified number of occasions, through an unidentified number of mailings and wirings." (Defendants' Memorandum at p. 11.) This, they contend, is insufficient to establish a *pattern* of racketeering activity as that term is defined under Seventh Circuit precedent.

■ RICO itself defines "pattern of racketeering activity" as at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). In an attempt to "sharpen the contours of this pattern requirement ... the [Supreme] Court has stated that, because Congress enacted RICO not out of concern for a sporadic fraudulent act but out of concern for long-term conduct, a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Vicom*, 20 F.3d at 779 (quoting *H.J. Inc., v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989)). Thus, to show a pattern of racketeering activity, a plaintiff must allege "both continuity and relationship among the predicate acts." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986).

There is clearly a sufficient relationship among the predicate acts alleged in the complaint: All of the allegedly fraudulent acts relate to the insurance overcharges. Thus, continuity is the central question in this case. "Continuity is 'both a closed-and-open-ended concept.'" *Midwest Grinding Co., Inc., v. Spitz*, 976 F.2d 1016, 1022 (7th Cir.1992) (quoting *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902). Here, we are concerned with closed-end continuity because the complaint alleges racketeering activity which has come to a close, not conduct which by its nature projects a future criminal activity. *See id.*

■ The Seventh Circuit has indicated that the determination as to whether there is continuity so as to establish a pattern of racketeering activity is a fact-specific inquiry which hinges on the four factors identified in the *Morgan* case. The Court must therefore weigh: (1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries. *See Gagan*, 77 F.3d at 962–63.

■ First, we look at the number, variety, and time-span of the alleged predicate acts, the most important of the four *Morgan* factors. *See Gagan*, 77 F.3d at 963. The plaintiffs allege a substantial number of predicate acts of mail and wire fraud over the course of nearly seven years. This clearly weighs in favor of a finding of a sufficient allegation of a pattern of racketeering activity. However, the plaintiffs do not allege any variety in the types of predicate acts upon which they rely for this cause of action. All the predicate acts alleged consist of mail and wire fraud in effectuating the alleged insurance overcharge scheme. The lack of variety itself weighs against a finding of a pattern; the fact that the complaint relies exclusively on instances of mail and wire fraud is especially problematic for the plaintiffs because the Seventh Circuit "does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Vicom*, 20 F.3d at 781 (quoting *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir.1990)). This sensible skepticism is based upon the fact that under the mail and wire fraud statutes, each mail-

ing or wiring is a separate act of mail fraud, even if each relates to the same scheme to defraud. *See Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1278 (7th Cir.1989). "Thus, the number of offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance." *Id.* This in turn "encourages bootstrapping of ordinary civil fraud cases into RICO suits." *Id.*

In addition, both the second and third *Morgan* factors militate against a finding of a pattern. The pattern of racketeering alleged involves only one scheme—overcharging for insurance—and one victim—Maryland Staffing. *See Vicom,* 20 F.3d at 781–82. Although this, in and of itself, does not preclude a finding of an allegation of a pattern, *see Morgan,* 804 F.2d at 975–76, these factors further tip the scales against a finding of an adequate allegation of a pattern.

■ Finally, the Court concludes that the fourth *Morgan* factor weighs against a finding of a pattern. Although the plaintiffs claim that they suffered a separate and distinct injury each and every time Manpower billed them for the inflated insurance rates, the Court concludes that this does not allege separate and distinct injuries. There appears to be a divergence in authority within the Seventh Circuit as to whether each alleged overcharge constitutes a separate and distinct injury. The recently-decided *Gagan* case noted that under a similar scheme to the one alleged here, "each instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing." *Gagan,* 77 F.3d at 963 (citing *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1305 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989)). In contrast, in the *Vicom* case, the Seventh Circuit reached the following conclusion reaffirming the holding of *United States Textiles v. Anheuser–Busch Co.,* 911 F.2d 1261 (7th Cir.1990): "[I]n *United States Textiles,* we did not find that the defendant suffered [a distinct] economic injury each time [the plaintiff] ordered and it shipped ... under the [contract] terms." *Vicom,* 20 F.3d at 782 (quoting *United States Textiles,* 911 F.2d at 1269). Thus, the *Vicom* court concluded that economic injuries arising out

of the same original contract and similar predicate acts are not separate and distinct injuries for the purpose of establishing a pattern of racketeering activity. *Id.*

In our view, the *Vicom* approach makes more sense. We agree that the "natural and common sense approach to the pattern element of RICO would instruct that identical economic injuries suffered over the course of [several] years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO." *Vicom,* 20 F.3d at 782 (quoting *United States Textiles,* 911 F.2d at 1269). Accordingly, we conclude that Maryland Staffing has failed to allege separate and distinct injuries.

Even accepting all the allegations in the plaintiffs' complaint as true, the Court cannot conclude that the RICO counts allege a pattern of racketeering activity. The only *Morgan* factors weighing in the plaintiffs' favor are the length of time during which the alleged fraudulent acts occurred and the number of predicate acts alleged. As discussed above, all other factors weigh against a finding of a pattern of racketeering activity. As the Seventh Circuit concluded after analyzing its post-*Sedima* civil RICO jurisprudence, "What seems clear from these cases is that multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." *Tellis v. U.S. Fidelity & Guaranty Co.,* 826 F.2d 477, 478 (7th Cir.1986). Accordingly, the Court concludes that the plaintiffs' failure to allege a pattern of racketeering activity provides an independent basis for dismissing the RICO claims in the complaint.

### 3. RICO Summary.

In our view, Maryland Staffing has attempted to "fit a square peg in a round hole by squeezing [a] garden-variety business dispute[ ] into [a] civil RICO action." *Midwest Grinding,* 976 F.2d at 1025. Not every commercial dispute is remediable under the RICO: "While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common-law cause of action

available to remedy business deals gone sour." *Id.* (citations omitted). This complaint fails to allege a violation of RICO because it fails to allege fraud with particularity and fails to adequately allege a pattern of racketeering activity. Accordingly, Counts 1, 2, 6, and 7 will be dismissed.

## C. Plaintiffs' Antitrust Claims.

The plaintiffs have asserted a total of six separate state and federal antitrust claims against Manpower. Counts 3 and 8 of the complaint allege conduct that violates federal antitrust law; Counts 4 and 9 allege violations of Maryland's antitrust laws; and Counts 5 and 10 allege violations of the Wisconsin antitrust laws. The defendants move to dismiss all of these counts for failure to state a claim upon which relief can be granted.

### 1. Federal Antitrust Claims.

The Third and Eighth Count of the complaint allege violations of the Sherman Act, 15 U.S.C. § 1, *et. seq.* The plaintiffs contend that the agreement between Maryland Staffing and Manpower—whereby Manpower allegedly forced Maryland Staffing to buy excessively overpriced insurance as a condition of using the Manpower name—constitutes an unlawful tying arrangement which violates § 1 of the Sherman Act. The defendants move to dismiss these counts on the grounds that (1) the complaint fails to allege a tying arrangement, and (2) the complaint fails to allege an antitrust injury.

■ A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Railroad Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The seller uses the tying arrangement to shelter one product from an open, competitive market by increasing its sales through a coerced, tie-in purchase to a more successful product. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The antitrust laws prohibit such arrangements because they restrain free competition in the market for the tied product.

■ In support of its motion to dismiss these claims, Manpower contends that the complaint does not allege an illegal tying arrangement. First, Manpower contends that there is no tying arrangement because Maryland Staffing does not actually purchase insurance from it; rather, the expense deductions for workers' compensation and liability insurance from Maryland Staffing's monthly sales constitutes a "passing on" of costs to the branch and representative offices. We reject this argument. The fact that Manpower did not directly sell the insurance to Maryland Staffing does not place the arrangement outside the scope of the Sherman Act. An arrangement whereby a franchisee is required to purchase products or services from a third party can constitute an illegal tying arrangement. *See Tire Sales Corp. v. Cities Service Oil Co.,* 637 F.2d 467, 474 (7th Cir.1980), *cert. denied,* 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981). However, in order for the plaintiffs to maintain this claim, they will have to establish that Manpower had some economic interest in the third party suppliers (i.e. the insurance companies): "[T]here is no illegal tying arrangement where a 'tying' company has absolutely no financial interest in the sales of a third company whose products are favored by the tie-in." *Ohio–Sealy Mattress Manufacturing Co. v. Sealy Inc.,* 585 F.2d 821, 835 (7th Cir.1978) (citations omitted), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979).

■ Manpower next argues that there is no tying arrangement because the insurance provided to Maryland Staffing temporary employees was merely a component of the franchise agreement. In order to establish the existence of an illegal tying arrangement, Maryland Staffing must demonstrate that there are two separate and distinct products or services; if the products or services are simply component parts of a single product, no tying arrangement exists. *Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756 (7th Cir.1996) (sale of a computer operating system that contains numerous component silicone chips cannot be considered an illegal tying arrangement); *Jack Walters & Sons Corp. v. Morton Build-*

*ing, Inc.*, 737 F.2d 698, 704 (7th Cir.1984) (a building exists as a single product, not a number of parts that can illegally be tied together), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984).

■ *Jefferson Parish* presented the general approach for determining whether products are separate or components for tie-in purposes: products are separate if there are separate markets for each product. *Jefferson Parish*, 466 U.S. at 21, 104 S.Ct. at 1563. However, the Seventh Circuit noted that this approach is not particularly helpful; for example, while sugar and cereal may be different markets, no one would consider "sugary cereal" a tie-in product. *Jack Walters & Sons*, 737 F.2d at 704. Thus, besides employing the "separate market" analysis, the Court must consider the overall efficiency and benefit to competition that might result by selling parts together. *Digital Equipment*, 73 F.3d at 761.

While temporary staffing and insurance certainly appear to constitute different markets, the wording of the contract, the interaction between the markets, and the efficiency for both parties of building the insurance clause into the contract creates a considerable amount of ambiguity as to whether this purchase of insurance is a component part of the representative contract. This ambiguity makes it impossible for the Court, at this time, to rule on whether or not insurance existed as a component part of the agreement. Accordingly, the Court concludes that the complaint adequately alleges an illegal tying arrangement.

The second basis for the defendants' motion to dismiss is that the plaintiffs have failed to allege an antitrust injury. Antitrust laws were enacted for " 'the protection of *competition,* not *competitors.*' " *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). At first glance, Maryland Staffing appears to be claiming an injury relevant only to them, not to competition in the insurance market generally. However, at this stage of the proceedings, the Court cannot determine the exact impact of this transaction on competition within the markets. Manpower is not an insurance provider; it purchases insurance from an insurance provider to protect, under the terms of the agreement, its temporary employees. We doubt that Manpower's alleged overcharging of Maryland Staffing has a substantial effect on the insurance market, although it is certainly possible that Manpower exercises oligopsonistic buying power in the market. This possibility forecloses dismissal at this stage of the proceedings. Therefore, the Court will reserve passing judgment until the evidentiary record is more fully developed.

Although the Court is somewhat skeptical of the plaintiffs' ability to establish a violation of the Sherman Act, drawing all inferences in the plaintiffs' favor, it is conceivable that they will be able to maintain these causes of action for illegal tying arrangements. Accordingly, the defendants' motion to dismiss Counts 3 and 8 will be denied.

### 2. State Antitrust Claims.

Counts 4, 5, 9, and 10 of the complaint all allege either Maryland or Wisconsin state antitrust violations. The defendants move to dismiss all four counts because the complaint alleges an interstate injury, whereas Maryland and Wisconsin antitrust laws are concerned only with intrastate injuries.

■ It is clear that Maryland antitrust law is concerned exclusively with intrastate commercial activity. Under the Maryland Antitrust Act, a "person may not (1) [b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce." Maryland Commercial Law Code Ann. § 11–204(a)(1). The Maryland Act defines trade or commerce as "all economic activity *within the state.*" Maryland Commercial Law Code Ann. § 11–201(h) (emphasis added). Further, the statute specifies that the purpose of the Maryland Antitrust Act is to "protect the public and foster fair and honest *intrastate competition.*" Maryland Commercial Law Code Ann. § 11–202(a) (emphasis added).

Wisconsin law will likewise only punish intrastate antitrust violations. At the beginning of the century, the Wisconsin Supreme

Court held that an alleged conspiracy to fix prices relating to shipping wood in Wisconsin and Michigan was subject to federal law only because the transaction involved interstate commerce. *See Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 168 Wis. 400, 170 N.W. 230, *cert. denied,* 249 U.S. 610, 39 S.Ct. 291, 63 L.Ed. 800 (1919); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 615, 147 N.W. 1058, 1062 (1914). Recent case law has continued to reaffirm this proposition of Wisconsin antitrust law. *Grams v. Boss,* 97 Wis.2d 332, 346, 294 N.W.2d 473, 480 (1980) (the Wisconsin antitrust law "was intended as a re-enactment ... of the federal Sherman Antitrust Act ... with application to intrastate as distinguished from interstate transactions"); *State v. Waste Management of Wisconsin, Inc.,* 81 Wis.2d 555, 574, 261 N.W.2d 147, 155, *cert. denied,* 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 175 (1978) (state act applies to intrastate commerce while federal act applies to interstate commerce); *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis.2d 402, 410, 198 N.W.2d 363, 367 (1972); *American Medical Transp., Inc. v. Curtis–Universal, Inc.,* 148 Wis.2d 294, 299, 435 N.W.2d 286, 288–89 (App.1988), *rev'd on other grounds,* 154 Wis.2d 135, 452 N.W.2d 575 (1990); *Independent Milk Producers Co-op v. Stoffel,* 102 Wis.2d 1, 6–7, 298 N.W.2d 102, 104 (App. 1980).

The only question remaining is whether the activities in the current case constitute interstate commerce. Maryland Staffing claims that the issue of whether these transactions are interstate is a question of fact to be determined at trial. The Court disagrees. "Interstate commerce," is to be defined broadly; while a contract between citizens of different states does not itself constitute interstate commerce, the correspondence and other events which culminate in a contract will be enough to qualify as interstate commerce. *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 547, 64 S.Ct. 1162, 1170, 88 L.Ed. 1440 (1944). *See also North American Co. v. Securities and Exchange Commission,* 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1946) (a business that relies on contacts with subsidiaries through mail engages in interstate commerce); *Associated Press v. National Labor Relations Board,* 301 U.S. 103, 128, 57 S.Ct. 650, 654, 81 L.Ed. 953 (1937) ("Interstate communications of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution.")

Here, Maryland Staffing of Maryland and Manpower of Wisconsin in all likelihood negotiated the franchise agreement across state lines. The franchise operated in Maryland. Any monitoring of the deal was done by Manpower from its offices in Wisconsin. Payments to and from either party must have been sent via mail; any necessary communications via phone, mail or fax across state lines. The dealings between the companies certainly fall within the Supreme Court's sweeping definition of "[i]nterstate communications of a business nature." For these reasons, the Court finds that the activities conducted between Maryland Staffing and Manpower were of an interstate nature and therefore are not subject to the individual state antitrust claims. Counts 4, 5, 9, and 10 shall therefore be dismissed.

**D. Plaintiffs' Claims Under the Maryland Franchise Registration and Disclosure Law.**

The defendants have moved to dismiss Count 11 of the complaint on the ground that the Maryland Franchise Registration and Disclosure Law did not become effective until seven years after the franchise agreement between Manpower and Maryland Staffing was executed. The plaintiffs have failed to respond to this argument.

Upon review of the Maryland statute, it is clear that it did not take effect until July 1, 1981. *See* Maryland Laws of 1981, Ch. 2 (1 CCH Bus.Franchise Guide ¶ 3200). The franchise agreement between the parties was executed on April 29, 1974—seven years earlier. In addition, section 14–203(c) of the statute provides, "This subtitle does not apply to the renewal or extension of an existing franchise if there is no interruption in the operation of the franchised business;" thus, the fact that the Maryland Staffing/Manpower contract was renewed after the statute went into effect does not bring the statute

into force. Accordingly, the Court concludes that the Maryland Franchise Registration and Disclosure Law does not apply to this dispute. Count 11 of the complaint will therefore be dismissed.

### E. Plaintiffs' Claims Under the Wisconsin Franchise Investment Law.

Count 12 of the complaint alleges a cause of action under the Wisconsin Franchise Investment Law (WFIL), Ch. 553, *Wis.Stats.* The defendants move to dismiss this count on the ground that the WFIL does not apply to a franchisee (such as Maryland Staffing) located outside of the State of Wisconsin.

■ Section 553.51 of the WFIL grants a franchisee a cause of action against the seller of a franchise when the sale was effectuated by fraud. This provision of the statute applies "when a sale or offer to sell is made in this state or when an offer to purchase is made and accepted in this state." *Wis.Stats.* § 553.59(1). The applicability provision further provides that "an offer to sell or purchase is made within this state ... when the offer originates in this state or is directed by the offeror to this state and received by the offeree in this state." *Wis.Stats.* § 553.59(2). We read this section to require that (1) either the offer to sell or purchase the franchise (a) originates in Wisconsin or (b) is directed to Wisconsin *and* (2) the offer to sell or purchase is received in Wisconsin. This reading is supported by the legislative history of the WFIL, which makes it clear that the legislature was concerned with protecting "Wisconsin franchisees," which the state legislature believed to have suffered substantial losses as a result of unscrupulous franchisors. 1971 Wis.Laws, Ch. 241, § 1.

■ The plaintiffs claim that the complaint, fairly interpreted, should be read to allege that Manpower's offer to provide a franchise to Maryland Staffing must have originated in the State of Wisconsin and therefore the agreement comes within the scope of the statute. However, the complaint fails to allege that any facts which would support an inference that the offer was received by Maryland Staffing in Wisconsin. Maryland Staffing was a Maryland franchise, not a Wisconsin franchise. Accordingly, the Court concludes that Count 12 fails to state a claim upon which relief can be granted and therefore will be dismissed.

### F. Plaintiffs' Common Law Misrepresentation Claims.

Count 13 of the complaint asserts a common law cause of action for intentional misrepresentation; Count 18 alleges negligent misrepresentation. Specifically, the plaintiffs allege that Manpower made affirmative misrepresentations (both intentionally and negligently) when it charged Maryland Staffing inflated prices for insurance. (The misrepresentation being, "Maryland Staffing owes $X for insurance" when in reality Maryland Staffing actually owed less than $X.) Plaintiffs further claim that Manpower failed to disclose facts (the actual insurance charges) that it had a duty to disclose to Maryland Staffing.

The defendants first move to dismiss the intentional misrepresentation claim on the ground that the circumstances constituting the alleged fraud have not been pleaded with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons discussed in section III.B.1.b., *supra,* the Court concludes that the plaintiffs have failed to plead the circumstances constituting the alleged fraud with the requisite particularity. The complaint fails to specify which defendant(s) made the decision to defraud the plaintiffs, when the decision was made, how the alleged misrepresentations were communicated to the plaintiffs, or any of the circumstances surrounding the alleged scheme. *See Vicom,* 20 F.3d at 777–78. Accordingly, Count 13 of the complaint will be dismissed for failure to comply with Rule 9(b).

■ The defendants also move to dismiss the plaintiffs' negligent misrepresentation claim because it is based upon Manpower's failure to disclose the alleged insurance overcharges and that the defendants owed the plaintiffs no duty to disclose this information. While it is true that a failure to disclose a fact is not actionable absent a duty to disclose, *see Ollerman v. O'Rourke Co. Inc.,* 94

Wis.2d 17, 288 N.W.2d 95 (1980),[2] the complaint in this case alleges actual misrepresentations of fact—statements by Manpower that Maryland Staffing owed a certain amount for insurance when it really owed less—not a failure to disclose facts. Accordingly, the Court need not address the question of whether Manpower was under a duty to disclose any information to Maryland Staffing. Because the complaint adequately alleges a cause of action for negligent affirmative misrepresentations, the defendants' motion to dismiss Count 18 will be denied.

### G. Plaintiffs' Common Law Conversion Claim.

In Count 14 of the complaint, the plaintiffs assert a common law conversion claim against Manpower. The plaintiffs contend that Manpower wrongfully converted money belonging to Maryland Staffing by overcharging Maryland Staffing for insurance. The defendants move to dismiss this count of the complaint on the ground that it fails to adequately allege a cause of action for conversion.

■■■ "Conversion is the wrongful or unauthorized exercise of dominion or control over a chattel." *Farm Credit Bank of St. Paul v. F & A Dairy*, 165 Wis.2d 360, 371, 477 N.W.2d 357 (App.1991), *review denied*, 482 N.W.2d 107 (1992). A "chattel" is an article of personal property—a thing personal and movable. *See* Black's Law Dictionary (5th Edition) at p. 215. It must consist of something identifiable and tangible.

The plaintiffs claim that the chattel converted by the defendants consists of the funds improperly taken by Manpower via the alleged insurance overcharges. This allegation would be sufficient to support a conversion claim if the complaint alleged that the defendants exercised dominion over a specific, identifiable quantity of currency belonging to Maryland Staffing. *See T.W.S., Inc. v. Nelson*, 150 Wis.2d 251, 252 n. 3, 440 N.W.2d 833 (App.1989). The complaint does not include such an allegation, however. It instead relies on a theory that the plaintiffs' intangi-

ble right to these funds was wrongfully converted by Manpower.

■■■ Historically, an action for conversion was based on the legal fiction that the plaintiff lost a chattel and that the defendant found it and converted it to his own use. *See* Prosser & Keeton on Torts (4th ed.) § 15 at pp. 79–81. Because intangible rights cannot be lost or found, "the original rule was that there could be no conversion of such property." *Id.* at p. 81. However, this rule has been relaxed to permit a plaintiff to recover for the full value of certain intangible rights where there is a conversion of a tangible thing in which intangible rights are merged. Restatement (Second) of Torts § 242. Thus, an action for conversion can now be maintained and a plaintiff can recover the full value of a check, a stock certificate, or an insurance policy. *See* Prosser & Keeton on Torts (4th ed.) § 15 at p. 83.

However, for conversion to lie—even where intangible rights are involved—there must be some tangible thing to which the intangible rights attach which is capable of being wrongfully controlled. There is no allegation in the complaint that the intangible right to money (which Maryland Staffing alleges Manpower converted) was represented by or connected to specific tangible objects. The complaint only alleges overcharges generally, and as such fails to allege a cause of action for conversion. Accordingly, the defendants' motion will be granted in this regard and Count 14 will be dismissed.

### H. Plaintiffs' Claim for Intentional Infliction of Emotional Distress.

The defendants move to dismiss Count 15 of the complaint for a failure to allege the elements of the tort of intentional infliction of emotional distress. The plaintiffs have apparently abandoned this cause of action; they have not responded to the defendants' motion in this regard. In light of this abandonment, and because the Court is satisfied that the complaint fails to allege all four elements of the tort of intentional infliction of

---

**2.** The parties apparently agree that Wisconsin law governs the plaintiffs' common law claims. Accordingly, for purposes of this motion, the

Court shall apply Wisconsin law. *See Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883, 886 (1987).

emotional distress, *see Alsteen v. Gehl,* 21 Wis.2d 349, 359–61, 124 N.W.2d 312 (1963), the defendants' motion will be granted and Count 15 will be dismissed.

### I. Plaintiffs' Claim for Breach of Contract.

■ At page 76 of the complaint, the plaintiffs at last reach what appears to be the heart of this dispute—a claim for breach of the franchise contract between Maryland Staffing and Manpower. The defendants move to dismiss this claim on the ground that it is barred by the six-year statute of limitations for breach of contract claims. *Wis. Stats.* § 893.43. According to the complaint, the alleged insurance overcharges began in 1987. This suit was commenced on December 27, 1994—nearly eight years later. Thus, according to the defendants, Count 16 must be dismissed to the extent that it depends upon acts or omissions taking place prior to December 27, 1989. In response, the plaintiffs rely upon the "discovery rule." They contend that the statute of limitations should be tolled until 1994 when they discovered the alleged overcharges. Thus, they submit, the claim is timely inasmuch as it was filed within two years of the discovery of the breach.

■ The plaintiffs' reliance on the discovery rule is misplaced because the rule does not apply to breach of contract actions. Under Wisconsin law, "a contract cause of action accrues at the moment the contract is breached, regardless of whether the injured party knew or should have known that the breach occurred." *CLL Associates Ltd. Partnership v. Arrowhead Pacific Corp.,* 174 Wis.2d 604, 607, 497 N.W.2d 115 (1993). Thus, any breach of the contract which took place more than six years prior to the commencement of this action is barred by the statute of limitations. Accordingly, to the extent Count 16 relies upon alleged breaches of the franchise agreement that occurred before December 27, 1989, it shall be dismissed. However, because the complaint alleges a series of breaches of the contract, the plaintiffs may assert a claim for damages from the date of the first breach within the period of limitation (*i.e.* after December 27, 1989). *Segall v. Hurwitz,* 114 Wis.2d 471, 491, 339 N.W.2d 333 (App.1983).

### J. Plaintiffs' Claim for Violation of the Duty of Good Faith and Fair Dealing.

In Count 17 of their complaint, the plaintiffs assert a cause of action against the defendants for a breach of the contract duty of good faith. The plaintiffs claim that the defendants breached this contract duty by overcharging Maryland Staffing for insurance and by concealing the overcharges. The defendants move to strike this claim pursuant to Federal Rule 12(f) on the basis that it is duplicative of the plaintiffs' breach of contract claim and is therefore redundant.

■ Wisconsin recognizes a cause of action for breach of the duty of good faith in the performance of a contract, though its contours are ill-defined. *See Market Street Associates Ltd. Partnership v. Frey,* 941 F.2d 588, 593–95 (7th Cir.1991) ("Market Street I"). The obligation to deal with a contractual partner in good-faith is used as "a protection device to approximate terms not actually contained in the contract, but those that would have been included 'expressly if at the time of making the contract [the parties] had had complete knowledge of the future.'" *Market Street Associates Ltd. Partnership v. Frey,* 21 F.3d 782, 786 (7th Cir.1994) ("Market Street II") (quoting *Market Street I,* 941 F.2d at 596). In this sense, the doctrine imposing a duty of good faith on parties to a contract amounts to the same thing as implying conditions into the contract. *See Market Street I,* 941 F.2d at 596 ("[W]hether we say that a contract shall be deemed to contain such implied conditions as are necessary to make sense of the contract, or that a contract obligates parties to cooperate in its performance in 'good faith' to the extent necessary to carry out the purposes of the contract, comes to much the same thing.").

■ Without question, Count 17 of the complaint overlaps with Count 16 (the "straight" breach of contract claim); both attempt to recover for the breach of an implied term in the franchise agreement. In all likelihood, these two Counts will constitute alternative claims for relief, permissible pleading under the Federal Rules. Fed.

R.Civ.P. 8(a). Despite this overlap, the Court cannot conclude that Count 16 and 17 are redundant so as to warrant striking Count 17. A motion to strike is disfavored by the courts, *see Williams v. Jader Fuel Co., Inc.,* 944 F.2d 1388, 1400 (7th Cir.1991), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992); *Heller Financial Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294 (7th Cir.1989), and the mere presence of redundant material in a pleading does not warrant granting a motion to strike, absent a showing of prejudice to the opposing party. *See* Wright & Miller, Federal Practice and Procedure: Civil 2d § 1382 at pp. 705–06. There is no showing of potential prejudice here. Moreover, upon review of the complaint and drawing all inferences in the plaintiffs' favor, the Court concludes that Count 17 adequately alleges a cause of action for breach of the duty of good faith. The plaintiffs may ultimately establish that certain terms regarding the insurance rates to be charged to Maryland Staffing and/or the obligation of Manpower to disclose overcharges should be read into the contract. Therefore the defendants' motion to dismiss this count will be denied.

### K. Plaintiffs' Negligence Claim.

█ In Count 19 of the complaint, the plaintiffs assert a negligence cause of action based upon an alleged breach of the defendants' duty of reasonable care to the plaintiffs in the course of their business dealings. Defendants move to dismiss this count on the ground that it is barred by the "economic loss" doctrine, which prohibits a plaintiff from using tort law to recover for a commercial loss. *See Miller v. U.S. Steel Corp.,* 902 F.2d 573, 574–75 (7th Cir.1990); *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis.2d 910, 921, 437 N.W.2d 213 (1989). Plaintiffs concede that the "economic loss" doctrine bars recovery in negligence for purely commercial injuries, but argue that the complaint also alleges non-economic personal injuries sustained by the individual plaintiffs. However, for the reasons discussed in section III.A., *supra,* the individual plaintiffs are not proper parties to this suit. And the complaint does not allege that the corporation itself suffered any non-economic injury. Accordingly, the Court concludes

that the plaintiffs' negligence claim is barred by the "economic loss" doctrine. Therefore, Count 19 will be dismissed.

### IV. ORDER

The defendants' motion to dismiss is granted in part and denied in part. Based upon the foregoing analysis and pursuant to Fed. R.Civ.P. 12(b)(6):

1. The Court concludes that plaintiffs John and Nancy Chandonnet do not have standing to assert individual claims against the defendants. Accordingly, **IT IS HEREBY ORDERED** that their claims be **DISMISSED.**

2. The Court further concludes that many of the causes of action asserted in the complaint fail to state a claim upon which relief can be granted. Accordingly, **IT IS HEREBY ORDERED** that Counts 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, and 19 be **DISMISSED.**

3. **IT IS FURTHER ORDERED** that the plaintiffs are barred from recovering in contract for any losses incurred prior to December 27, 1989 under *Wis.Stats.* § 893.43.

4. Finally, counsel for all parties are ordered to appear at *9:00 A.M. on Monday September 9, 1996* in Room 390, U.S. Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, for scheduling conference.